**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

ANTONIO REALI,

       Plaintiff,

v.                                     No. 2:19-CV-00603 MV/SMV

BOARD OF COUNTY COMMISSIONERS
FOR THE COUNTY OF DOÑA ANA, CORIZON
HEALTH, INC., CHRISTOPHER BARELA,
VERONICA SALAZAR, DAVID MILLER,
ROSLYN STROHM, KEVIN SILVA, and
CHAD HILL

       Defendants.

**AMENDED COMPLAINT FOR THE RECOVERY OF DAMAGES**
**CAUSED BY THE DEPRIVATION OF CIVIL RIGHTS**

      Plaintiff brings this amended complaint for damages caused by the violation of his civil and constitutional rights. Plaintiff files this complaint under the federal Civil Rights Act, and the Constitution of the United States. Plaintiff also brings claims under the New Mexico Tort Claims Act and Wrongful Death Act. In support of this Complaint, Plaintiff alleges the following:

**JURISDICTION AND VENUE**

1. Jurisdiction over the subject matter of this action is conferred by 28 U.S.C. § 1331 and 42 U.S.C. §§ 1983 and 1988.

2. Venue is proper as the acts complained of occurred exclusively within Doña Ana County, New Mexico.

**PARTIES**

3. Plaintiff Antonio Reali is an individual and resident of Fresno County, California. Mr. Reali was an inmate in the custody and care of the Doña Ana County Detention Center (hereinafter "DACDC") from May 31, 2017 to July 3, 2017.

4. While incarcerated, Mr. Reali was completely dependent upon DACDC for his care and well-being.

5. Defendant Board of County Commissioners for the County of Doña Ana ("Board") is a governmental entity within the State of New Mexico and a "person" under 43 U.S.C. § 1983.

6. At all times material to this Complaint the Board was the employer of the individual defendants.

7. During all material times Defendant Corizon Health, Inc. ("Corizon") was responsible for providing medical care to inmates at DACDC pursuant to contract with Defendant Board.

8. Defendant Corizon is a Delaware for Profit Corporation registered to do business in New Mexico.

9. At all material times Defendant Corizon acted through its owners, officers, directors, employees, agents, or apparent agents including, but not limited to, administrators, management, nurses, doctors, technicians and other staff are responsible for their acts or omissions pursuant to the doctrines of respondeat superior, agency or apparent agency.

10. At all material times, Defendant Christopher Barela was employed by DACDC as the facility detention administrator with supervisory duties.

11. Defendant Barela was acting under the color of state law and within the scope of his employment at all material times.

12. Defendant Barela is being sued in his official and individual capacities.

13. At all material times, Defendant Roslyn Strohm was employed by Defendant Corizon as a certified nurse practitioner.

14. Defendant Strohm was acting under the color of state law and within the scope of her employment at all material times.

15. Defendant Strohm is being sued in her individual capacity only.

16. At all material times, Defendant Veronica Salazar was employed by Defendant Corizon as a registered nurse.

17. Defendant Salazar was acting under the color of state law and within the scope of her employment at all material times.

18. Defendant Salazar is being sued in her individual capacity only.

19. At all material times, Defendant David Miller was employed by Defendant Corizon as a licensed practical nurse.

20. Defendant Miller was acting under the color of state law and within the scope of his employment at all material times.

21. Defendant Miller is being sued in his individual capacity only.

22. At all material times, Defendant Kevin Silva was employed by Defendant DACDC as a detention officer.

23. Defendant Silva was acting under the color of state law and within the scope of his employment at all material times.

24. Defendant Silva is being sued in his individual capacity only.

25. At all material times, Defendant Chad Hill was employed by Defendant DACDC as a detention officer.

26. Defendant Hill was acting under the color of state law and within the scope of his employment at all material times.

27. Defendant Hill is being sued in his individual capacity only.

## FACTUAL BACKGROUND

28. Antonio Reali is a military veteran who served the United States Army between 1981 and 1991.

29. Antonio served the Army in combat in the Gulf War.

30. At the time Antonio left the army, he had achieved an E4 Specialist rank.

31. After leaving the Army, Antonio married and had children.

32. Eventually, Antonio returned to service and joined the National Guard.

33. In 2004, Antonio was hired by a United States military contractor, where he served in Afghanistan and Iraq.

34. As a result of his time in combat, Antonio developed Post-Traumatic Stress Disorder.

35. On May 20, 2017 in Madera County, California, Antonio ran a stop sign and was pulled over.

36. The police officer ran Antonio's information and discovered he had a warrant for his arrest in Dona Ana County, New Mexico.

37. Antonio was booked into the Madera County jail to be extradited to the Doña Ana County Detention Center (DACDC).

38. Antonio was 53 years old.

39. When he arrived at the Madera County jail, Antonio advised medical staff he suffered from a heart condition.

40. Antonio told medical staff he had been prescribed nitroglycerin to treat his heart condition and needed a pill to be on his person at all times in the event he began suffering chest pain.

41. Medical staff ordered Nitroglycerin for Antonio and allowed him to keep one pill on his person at all times.

42. Antonio was extradited and transferred to the DACDC on May 31, 2017.

43. Throughout his time at DACDC, Antonio was a pretrial detainee.

44. Antonio was sent to DACDC with information about his medical condition from the medical staff at the Madera County jail.

45. This form indicated Antonio suffered chest pain and provided a list of medications he had been prescribed prior to his transfer.

46. When he arrived at the jail, Corizon medical staff Steven Gomez obtained a medical history from Antonio.

47. Antonio told Mr. Gomez he suffered from several serious medical and mental health issues, including a history of heart attacks, one occurring within 6 months of him being booked.

48. Antonio told Corizon medical employee that he needed his prescription of Nitroglycerin available to him in the event he began experiencing chest pain.

49. Mr. Gomez told Antonio he would not be given Nitroglycerin.

50. Antonio looked up into the security camera and stated medical staff was refusing to provide him his heart medication.

51. Antonio then told Mr. Gomez, "You're playing Russian roulette with my life."

52. After this initial examination, Antonio was housed in general population.

53. On June 6, 2017, Antonio began experiencing chest pain.

54. Antonio was taken to medical and was seen by Defendant Strohm, a certified nurse practitioner.

55. Antonio informed Defendant Strohm that he had a history of heart disease and experienced chest pain that sometimes would become so intense he would vomit or pass out because of the pain.

56. Antonio was given a dose of Clonidine, a blood pressure medication, then sent back to his cell.

57. Eleven days later, Antonio began complaining of chest pain again.

58. Antonio requested to be seen by medical staff.

59. By the time he was seen by a provider, his chest pain had subsided.

60. Antonio was given another dose of Clonidine then sent back to his cell.

61. Antonio did not receive any medical treatment through the remainder of June.

62. Antonio knew he needed medication for his heart condition, which the jail refused to provide.

63. Throughout Antonio's detention at DACDC, his ex-wife, Aurora Reali, contacted Corizon and DACDC staff to inform and remind them of the severity of Antonio's heart condition.

64. Ms. Reali frequently asked they provide Antonio with his heart medication.

65. Throughout his first month at DACDC, Antonio became increasingly concerned he would suffer a heart attack without his medication or medical care.

66. Antonio knew that suffering a heart attack would lead to serious health consequences.

67. Antonio also knew that the resuscitation efforts following a heart attack would cause serious, painful consequences, including broken ribs and brain damage.

68. Antonio became so afraid he would suffer a heart attack because of the lack of care he was receiving at DACDC, he requested a "DNR" (do not resuscitate) be put in place.

69. On July 1, 2017 at approximately 9:45 a.m., Antonio again began experiencing severe chest pain and requested medical care.

70. This was the third time Antonio had experienced chest pain in the jail.

71. Defendant Silva was assigned the Pod officer where Antonio was housed at that time.

72. DACDC was short staffed on this date.

73. Defendant Hill took over Defendant Silva's duties in "the bubble" while Defendant Silva took a break.

74. The "bubble" is the master control center where guards observe inmates housed in the jail pod.

75. While Defendant Hill was working in "the bubble," Antonio began asking for medical care.

76. Defendant Hill refused to call medical for Antonio until he fell onto the ground.

77. Antonio became upset at the guard in "the bubble," Defendant Hill, for refusing to contact medical.

78. By the time medical was finally contacted and arrived in his cell, Antonio's pain had become so intense he could no longer walk.

79. Antonio was taken to medical in a wheel chair.

80. When he arrived in medical, Antonio lied on the floor to try and relieve his pain.

81. Andrea Mook, a nurse, noted Antonio appeared pale.

82. Antonio told the nurse he had experienced three heart attacks in the past.

83. Antonio also reported his pain rated an 8/10 on the pain scale.

84. Antonio's chest pain was so intense that he threw up.

85. An EKG was conducted, which was noted to be abnormal, showing extensive ST-t wave changes compared to prior EKG results.

86. Antonio's chest pain combined with this EKG findings are consistent with cardiac ischemia or significant lack of blood flow and oxygen in the blood arteries of the heart.

87. Ms. Mook called Defendant Strohm and notified her that Antonio had abnormal vitals and EKG.

88. At this point Antonio should have immediately been sent to the hospital for evaluation for unstable angina or myocardial infarction (heart attack).

89. Instead of transporting Antonio to the hospital, another EKG was conducted.

90. This second EKG was normal.

91. It is possible to experience a heart attack in the presence of a normal EKG.

92. Despite being a patient with a normalized EKG, Antonio's recent chest pain with significant ischemic changes needed to be evaluated and observed under a monitored setting of a hospital.

93. Unstable ischemic syndromes carry a high morbidity and mortality.

94. Antonio should have been sent to the hospital to be evaluated for the cause of recurrent chest pains with ischemia with an appropriate treatment plan instituted.

95. Despite obvious signs and symptoms of a life-threatening problem, Antonio was sent back to his cell.

96. Later that evening, Antonio began experiencing chest pain again.

97. Officers on duty called a "Code Mary."

98. When staff arrived at Antonio's cell, he was lying on the floor groaning in pain.

99. Antonio was again taken to medical in a wheel chair.

100.     When he arrived in the medical department, Antonio was seen by Defendant Salazar.

101.     Medical staff conducted another EKG, which was borderline.

102.     Antonio was given another dose of Clonidine and sent back to his cell.

103.     Defendant Salazar then notified Defendant Strohm of her encounter with Antonio over the telephone.

104.     Neither Defendant Salazar nor Defendant Strohm made any attempt to get a second opinion or contact a cardiologist.

105.     The following day, July 2, 2017, Antonio was seen by Defendant Strohm.

106.     Antonio was, again, experiencing chest pain.

107.     Defendant Strohm noted Antonio had experienced "similar episodes" of chest pain earlier that morning, the night prior, and the morning prior.

108.     In fact, this was the fifth time he had been to medical after experiencing chest pain since he was booked into the jail only 31 days earlier.

109.     Defendant Strohm ordered two EKGs, both of which were abnormal.

110.     In fact, the first EKG at 9:11 a.m. showed a new intraventricular conduction delay and significant down-sloping ST depression in the lateral leads and horizontal ST depression in inferior leads consistent with significant ischemia.

111.     An urgent transfer for evaluation at the hospital was necessary.

112.     Antonio was again sent back to his cell without further medical care.

113.     Early the next morning, Antonio began experiencing severe chest pain again.

114.     By this time, Antonio's symptoms of a serious medical condition had become so obvious another inmate informed jail staff that Antonio was experiencing a heart attack.

115.     Defendant Silva was working in "the bubble" at that time.

116.     Defendant Silva saw Antonio collapse onto the ground and heard the other inmates' pleas to get Antonio medical care.

117.     Defendant Silva refused to contact medical for an unacceptable length of time.

118.     Sergeant Tiara Gamboa also recognized Antonio's obvious symptoms of a serious medical condition and described his symptoms in her report as walking slowly, grunting and holding his chest saying he was in pain.

119.     Eventually, Antonio was taken to medical.

120.     Upon information and belief, Antonio was unable to walk and was dragged out of the pod by his ankles by detention officers.

121.     When he arrived in medical, he told Defendants Miller and Salazar that he was in pain and could not breathe.

122.     Antonio was clutching his chest and told medical staff "It hurts, what's happening to me?"

123.     At this point, despite Antonio clearly experiencing an obvious medical emergency, no one called 911.

124.     Antonio then began seizing.

125.     Soon after this seizure, Antonio stopped breathing and lost consciousness.

126.     Antonio then lost bladder and bowel control.

127.     Approximately two minutes after Antonio stopped breathing, medical staff finally contacted 911.

128.     At approximately 3:51 a.m., Defendant Salazar noted Antonio no longer had a pulse.

129.     Finally, thirteen (13) minutes after Antonio lost consciousness, Defendants began CPR, at 3:55 a.m.

130.     Emergency medical staff arrived at approximately 3:56 a.m.

131.     The following was captured on handheld camera footage by jail staff.

132.     Defendant Salazar told paramedics they had given Antonio about "four of Ativan" about 10 minutes before they arrived.

133.     Defendant Salazar also told paramedics that Antonio had a seizure then lost consciousness.

134.     As Antonio lay unconscious on the medical table, DACDC medical staff, including Defendants Salazar and Miller, laughed, joked, and remained apparently unconcerned about Antonio.

135.     After several minutes of applying CPR, one of the EMTs asked Defendant Salazar to confirm Antonio had been complaining of chest pain over the past couple of days.

136.     Defendant Salazar responded, "Yeah. Mid- mid sternal chest pain, um, but we haven't really gotten anything real on the EKG. We'll give him clonidine and it resolves."

137.     Defendant Salazar confessed to emergency medical staff she knew Antonio had a history of heart attacks.

138.     Defendant Salazar told the EMT that the "provider [Defendant Strohm] has seen him a couple times but hasn't seen anything, I guess, worth sending him to the hospital for, I guess."

139.     Then, the EMT asked medical staff when they started CPR.

140.     Defendant Miller told her "We started CPR right as you guys were arriving just because I couldn't feel a pulse anymore."

141.     Defendant Salazar took over compressions for approximately 3 minutes.

142.     After these three minutes, another EMT took over compressions from Defendant Salazar.

143.     After Defendant Salazar stopped providing Antonio compressions, she shook her arms and laughed, "I'm out of shape, shit!"

144.     After approximately 15 minutes of CPR, EMTs were able to regain Antonio's pulse.

145.     While EMTs evaluated Antonio, Defendant Salazar asked Defendant Miller if she needed anything.

146.     In response, she told Defendant Miller that she needed "a fan" and fanned herself off with her hands, laughing.

147.     As EMTs moved Antonio onto a gurney, Defendants Salazar told Defendant Miller that she "was not expecting that, especially [inaudible] the last two days."

148.     Antonio was transferred to Memorial Medical Center for treatment.

149.     When he arrived at Memorial Medical Center, Antonio was immediately intubated.

150.     Antonio was diagnosed as having suffered a cardiac arrest and severe sepsis or septic shock.

151.     Antonio suffered broken ribs and a cracked sternum as a result of the CPR conducted.

152.     Memorial Medical Center staff noted that Antonio had suffered multiorgan failure as a result of his heart attack, including his kidney and liver, along with anoxic encephalopathy (brain damage as a result of oxygen deprivation).

153.     While in the emergency room, Antonio suffered another cardiac arrest.

154.     Antonio remained in the hospital for nine (9) days recovering from his heart attacks.

**COUNT I: VIOLATION OF DUE PROCESS**
**INADEQUATE MEDICAL CARE**
**(Defendants Strohm, Salazar, Miller, Silva, and Hill)**

155.     Plaintiff restates each of the preceding allegations as if fully stated herein.

156.     Plaintiff has a Fourteenth Amendment right to humane conditions of confinement and adequate medical care.

157.     Defendants knew chest pain is an obvious sign of a serious medical condition, including heart attack.

158.     Defendants knew they were unequipped to treat Antonio's heart condition at the jail.

159.     Defendants knew Antonio should have been transported a hospital for appropriate medical care.

160.     Defendants knew any medical provider in the community would send a patient experiencing chest pain to an emergency room for further evaluation.

161.     Defendants knew this was especially true when the patient has a history of heart attacks.

162.     Defendants knew Antonio had a history of heart attacks when he arrived at the jail.

163.     Antonio told medical staff he suffered a heart attack within six months of being booked into DACDC.

164.     Defendants Salazar and Miller were aware of Antonio's medical history from their own review of the medical records.

165.     In addition, Mr. Reali's ex-wife frequently called the facility and informed DACDC and Corizon staff of Antonio's serious heart condition.

166.    Ms. Reali's ex-wife also frequently called the facility and informed DACDC and Corizon staff that Antonio required medication for his serious heart condition.

167.    Defendants failed to provide Antonio medication or treatment for his cardiovascular history.

168.    Antonio began experiencing chest pain soon after being booked into the jail.

169.    Defendants failed to adequately respond to his medical condition.

170.    Defendants actively ignored Antonio's symptoms.

171.    As a certified nurse practitioner, Defendant Strohm was the highest-ranking medical staff at the facility.

172.    Defendant Strohm knew how to identify the signs and symptoms of a heart attack.

173.    Defendant Strohm ignored Antonio's symptoms of an impending heart attack and allowed his condition to worsen until he finally suffered a heart attack.

174.    Antonio was completely reliant on Defendants for his medical needs while at the jail.

175.    Antonio had no ability to contact 911 on his own while housed at the jail.

176.    Defendants acted as gate-keepers to Antonio's care.

177.    Defendants Silva and Hill watched as Antonio suffered chest pain and an eventual heart attack.

178.    Defendants Silva and Hill failed to contact medical even in face of an obvious medical emergency.

179.    Instead of contacting medical staff immediately, Defendants Silva and Hill waited to contact medical for Antonio.

180.    Defendants Silva and Hill's decision to wait to contact medical care caused Antonio's condition to worsen.

181.    Defendants refused to contact emergency medical care for Antonio in the weeks and days leading up his heart attack and cardiac arrest on July 3, 2017.

182.    On July 1, 2017, Antonio began experiencing symptoms of a heart attack.

183.    Antonio required immediate hospitalization on July 1, 2017.

184.    Instead, Defendants sent Antonio back to his cell.

185.    Antonio returned to medical four (4) more times complaining of chest pain before he finally was sent to the hospital.

186.    Defendants knew Antonio's chest pain was so excruciating he was vomiting and even passing out as a result.

187.    Antonio suffered a heart attack on July 3, 2019.

188.    The severity of Antonio's condition was obvious to everyone who saw him.

189.    The seriousness of Antonio's medical condition was so obvious that inmates in the pod with Antonio attempted to get him medical care for his heart attack.

190.    Defendants Salazar and Miller called 911 only after Antonio had experienced a seizure, lost consciousness, bowel, and bladder control following cardiac arrest on July 3, 2017.

191.    Defendant Salazar and Miller failed to begin life-saving measures, including CPR for several minutes after Antonio lost consciousness and they were not able to detect a pulse.

192.     Defendants Salazar and Miller knew the risks Antonio faced when he faced an extended length of time without oxygen to his brain.

193.     Defendants Salazar and Miller still failed to begin CPR until one minute before emergency medical staff arrived at the jail.

194.     While Antonio lay unconscious with no pulse in the medical department at DACDC, Defendants Salazar and Miller exhibited no compassion or concern for their patient.

195.     Defendants were deliberately indifferent to a serious and obvious medical need when they failed to treat Plaintiff's chest pains.

196.     As a proximate and foreseeable result of Defendants' deliberate indifference to Mr. Reali's serious, obvious medical condition, Plaintiff suffered injuries including physical injuries, pain and suffering, emotional distress, exacerbation of his medical condition.

## COUNT II: NEGLIGENT PROVISION OF MEDICAL CARE
### (Defendants Corizon, Roslyn Strohm, David Miller, and Veronica Salazar)

197.     Plaintiff restates each of the preceding allegations as if fully stated herein.

198.     Defendants had a duty to ensure Antonio received adequate care while housed at DACDC.

199.     Antonio began experiencing severe chest pain on July 1, 2017.

200.     Defendants knew Antonio had a history of chest pain and cardiac issues, both prior to and during his detention at DACDC

201.     Antonio began experiencing chest pain so severe it caused him to vomit and pass out.

202.     The standard of care required immediate transport to a hospital once he began exhibiting these symptoms.

203.     A reasonable healthcare provider would have adhered to the medical standard of care.

204.     A reasonable healthcare provider would have transported Antonio to a hospital the moment he began exhibiting symptoms of chest pain.

205.     Upon information and belief, Defendant Corizon has created a policy of refusing transport of inmates to the hospital as a cost-saving strategy.

206.     Defendant Corizon employs medical staff at DACDC.

207.     Defendant Corizon is vicariously liable for the acts and omissions of its employees by respondeat superior.

208.     Defendant Corizon had a duty to properly and adequately train its medical staff to respond properly to emergency situations.

209.     Defendants breached their duty of care.

210.     Defendants' negligence caused Antonio to suffer damages.

211.     Defendants' negligence was the proximate cause of this damage.

212.     As a proximate and foreseeable result of Defendants' negligence to Mr. Reali's serious, obvious medical condition, Plaintiff suffered injuries including physical injuries, pain and suffering, emotional distress, exacerbation of his medical condition.

### COUNT III: NEGLIGENT MAINTENANCE OF A MEDICAL FACILITY
### (Defendants Board Christopher Barela, and Corizon Health, Inc.)

213.     Plaintiffs restate each of the preceding allegations as if fully stated herein.

214.     Defendant Board contracted with Defendant Corizon to provide medical care at its facilities.

215.     The contract between Defendant Board and Defendant Corizon included the day-to-day operation of the medical facility by Corizon.

216.     Defendant Board oversaw the contract and medical care provided by Corizon.

217.     Defendant Board had an obligation to ensure Corizon provided inmates in the care of DACDC with adequate medical care.

218.     Defendant Board allowed Defendant Corizon to provide substandard care, or no care at all, to inmates in its facility.

219.     Upon information and belief, Defendant Corizon refused to take inmates to the hospital even when clinically necessary as a cost-saving mechanism.

220.     Defendant Corizon failed to provide the level of care required under its contract and the Constitution.

221.     In 2016, Defendant Corizon lost its contract with the New Mexico Department of Corrections (NMCD) to provide medical care to state inmates.

222.     NMCD's decision not to renew its contract with Corizon to provide medical care followed approximately 150 lawsuits by 200 inmates alleging inadequate or unaddressed medical care by Corizon.

223.     Defendant Board knew Defendant Corizon had come under scrutiny nation-wide for its failure to provide adequate medical care to inmates.

224.     Despite this knowledge, Defendant Board contracted with Corizon to provide medical care to inmates at DACDC.

225.     Defendants Board and Barela failed to monitor the contract between the County and Corizon to ensure inmates at DACDC received adequate care.

226.     As a proximate and foreseeable result of Defendants' negligence, Plaintiff suffered injuries including physical injuries, pain and suffering, emotional distress, exacerbation of his medical condition.

## COUNT IV: CUSTOM AND POLICY OF VIOLATING CONSTITUTIONAL RIGHTS
### (Defendants Board and Christopher Barela)

227.     Plaintiffs restate each of the preceding allegations as if fully stated herein.

228.     Defendant Board delegated the responsibilities of running DACDC to Defendant Christopher Barela.

229.     Pursuant to state law, jail administrators acting in their official capacity are regarded as the final policy makers of their respective institutions.

230.     Defendant Barela was therefore the final policy maker responsible for the hiring training and supervision of DACDC employees during her tenure.

231.     Defendants Barela's policies therefore became the customs and policies of the County.

232.     During his tenure, Defendant Barela practiced a custom and policy of providing inadequate medical care to inmates at DACDC.

233.     During his tenure as the director of DACDC, Defendant Barela was charged with embezzlement, related to a misuse of the facility's inmate welfare fund.

234.     Prior to this charge, Defendant Barela allowed a man, Steven Slevin, in his care to be left in solitary confinement for 22 months without mental health or medical care, causing him to deteriorate to an unacceptable level.

235.     This case eventually went to trial, where a jury awarded Mr. Slevin $22 million.

236.     Despite this enormous verdict, Defendant Barela continued his policy of indifference to the medical care of inmates.

237.     Despite this enormous verdict, Defendant Board allowed Defendant Barela to remain as the facility director, providing inadequate medical care to inmates at DACDC.

238.     The policies, customs, decisions, and practices of Defendant Barela created a climate within DACDC where staff was unwilling to obtain medical care for inmates, even in the face of a clear medical emergency.

239.     Several days after Antonio suffered his heart attack, Defendant Barela was placed on leave after criminal charges were brought against him for possession of a controlled substance.

240.     Defendant Barela operated DACDC under policies and practice of providing unconstitutional care of inmates, especially related to the provision of medical care.

241.     Defendant Barela created an environment where detention officers did not contact medical staff for inmates experiencing medical emergencies, including chest pains, even if those emergencies were obvious.

242.     Defendant Barela's policies created an environment where his staff were indifferent to chest pains.

243.     Defendants Hill and Silva's actions during Antonio's detention followed the policies and practice put in place by Defendant Barela.

244.     There is a causal connection between Defendant Barela's policies and the violation of Antonio's constitutional rights, which amounts to deliberate indifference.

245.     As a proximate and foreseeable result of Defendants' deliberate indifference to Mr.

Reali's serious, obvious medical condition, Plaintiff suffered injuries including physical

injuries, pain and suffering, emotional distress, exacerbation of his medical condition.

## **JURY DEMAND**

246.     Plaintiffs hereby demand a trial by jury on all counts.

WHEREFORE, Plaintiffs requests judgment as follows:

1. Compensatory damages in an as yet undetermined amount, jointly and severally against all
   Defendants, including damages for attorney's fees and emotional harm.

2. Punitive damages in an as yet undetermined amount severally against the individually
   named Defendants.

3. Reasonable costs and attorney's fees incurred in bringing this action.

4. Such other and further relief as the Court deems just and proper.


Respectfully submitted,

COYTE LAW P.C.

/s/ Alyssa D. Quijano
Alyssa D. Quijano
Matthew E. Coyte
Attorneys for Plaintiff
3800 Osuna Road NE, Suite 2
Albuquerque, NM 87109
(505) 244-3030