**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

ANTONIO REALI,

      Plaintiff,

v.                                                    No. 2:19-CV-00603 MV/SMV

BOARD OF COUNTY COMMISSIONERS
FOR THE COUNTY OF DOÑA ANA, CORIZON
HEALTH, INC., et al.

      Defendants.

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS DAVID MILLER,
ROSLYN STROHM, AND VERONICA SALAZAR'S MOTION FOR PARTIAL
SUMMARY JUDGMENT BASED ON QUALIFIED IMMUNITY**

COMES NOW Plaintiff Antonio Reali, by and through his attorneys of record, Matthew

E. Coyte and Alyssa D. Quijano (Coyte Law P.C.), hereby responds in opposition to Defendants

David Miller, Roslyn Strohm, and Veronica Salazar's Motion for Partial Summary Judgment

Based on Qualified Immunity. [Doc. 78]. As support for his Response, Plaintiff submits the

following memorandum:

## I.   INTRODUCTION

During his time at the Doña Ana County Detention Center ("DACDC"), Antonio Reali

suffered from frequent chest pains and eventually succumbed to a heart attack. Starting his first

day at the jail on May 31, 2017, Antonio complained of his chest pain to medical staff but was

unable to obtain the emergent medical care he required to prevent serious damage. Over the course

of several weeks, Antonio presented to medical staff with severe pain, dangerously elevated blood

pressures, and consistently abnormal EKG results. Despite knowing he had suffered a heart attack

a few months earlier, Defendants shrugged off Antonio's emergent physical symptoms as anxiety

and disregarded his complaints. As a result, Antonio suffered cardiac arrest, physical injuries, and hospitalization.

Defendants Strohm, Salazar, and Miller, employees of Corizon Health, Inc., have requested the Court grant them qualified immunity. They have requested the Court expand the doctrine of qualified immunity to protect privately employed individuals and give them immunity from suit. As explained in detail below, Defendants are not entitled to this defense. Regardless, even if the Court does extend the privilege to these defendants, Plaintiff will demonstrate through both common sense and expert testimony that the failure to transport him to the hospital to receive adequate medical care was grossly unreasonable and indifferent. Despite repeatedly requesting help for his documented heart condition, the defendants decided to take the risk that he was just suffering from anxiety. This risk-taking behavior persisted over a significant period of time, and eventually resulted in Antonio losing consciousness, seizing, and losing control of his bladder and bowels. His subsequent heart attack has left him irreparably harmed mentally and physically.

Lastly, clear disputes of fact prohibit summary judgment. In their Motion, Defendants claim many times Antonio presented as "asymptomatic" or raised "no medical concerns." These assertions are contradicted by their own medical notes and records. Each time Plaintiff was seen by medical staff, he complained that he was in immense pain to the point of vomiting and passing out. The symptoms he presented with were so severe that even a lay person would recognize them as urgent. Even without his overt complaints, Defendants consistently recorded concerning and life-threatening diagnostic results, including abnormal vitals and EKG readings. Defendants claim no disputes of fact exist to prevent judgment as a matter of law but clearly dispute the symptoms Plaintiff presented with and their severity. Of course, these symptoms indicate what adequate medical care would have been for Antonio at the time of the incident. The disputes of

fact of the severity of Antonio's medical condition at the times Defendants evaluated him prevent summary judgment in this case. Additionally, Plaintiff will demonstrate the medical defendants in this case are not entitled to qualified immunity as a matter of law.

## II.    FACTUAL DISPUTES

Plaintiff disputes Defendants' "Undisputed Material Facts" as Disputed Material Facts ("DMF") in the following manner:

1. Plaintiff disputes that his grand jury indictment is material to the legal issues involving the medical care he received at DACDC but admits the factual contentions contained in ¶ 1.

2. Plaintiff disputes that his bench warrant is material to the legal issues involving the medical care he received at DACDC but admits the factual contentions contained in ¶ 2.

3. Plaintiff disputes that his plea or criminal charges are material to the legal issues involving the medical care he received at DACDC but admits the factual contentions contained in ¶ 3.

4. Plaintiff admits the factual contentions contained in ¶ 4.

5. Plaintiff admits the factual contentions contained in ¶ 5 and adds that he arrived at DACDC with medical records from the Madera County Detention Center that indicated he had a history and complaints of chest pain [DOC 78-3] at COR-Reali000214.

6. Plaintiff admits the factual contentions contained in ¶ 6.

7. Plaintiff disputes the factual contentions contained in ¶ 7. Plaintiff was not seen for two separate intakes. Records reflect an intake was completed by Steve Gomez at 1:29 a.m. on May 31, 2017, a summary of which was also documented in an electronic progress notes at 3:36 a.m. *Compare* [DOC 78-3] at COR-Reali000108-114 and [DOC 78-3] at COR-Reali000147.

8. Plaintiff admits the factual contentions contained in ¶ 8 but adds that the information reported on the electronic progress note that Defendants cite to reflects the same information noted

by nurse Steven Gomez upon intake. [DOC 78-3] at COR-Reali000108-114. Further, Steven Gomez's intake notes reflect Plaintiff's history of a heart condition and recent heart attack [DOC 78-3] at COR-Reali000110.

9. Plaintiff admits the factual contentions contained in ¶ 9.

10. Plaintiff disputes that he did not raise significant medical concerns to Defendant Strohm at the Chronic Care Clinic on June 6, 2017. Defendant Strohm's hand-written notes indicate he did report serious medical concerns. [DOC 78-3] at COR-Reali000154-5. These notes indicate that Plaintiff was seen at the Chronic Care Clinic by Defendant Strohm for his coronary artery disease (CAD) and seizures. Defendant Strohm noted Antonio indicated he "has chest pains" which was "relieved sometimes [with] deep breathing 'sometimes vomits.'" [DOC 78-3] at COR-Reali000154. She also noted that he sometimes "passes out from [chest] pain." *Id*.

11. Plaintiff disputes his prescription of Depakote is relevant to the treatment of his emergent heart condition at DACDC but admits the factual contentions contained in ¶ 11.

12. Plaintiff admits the factual contentions contained in ¶ 12 but clarifies that he stated his pain would only "go away" after he "passes out from pain," vomits, or forces himself to breathe deeply. [DOC 78-3] at COR-Reali000154; [DOC 64-3] at ¶ 18.

13. Plaintiff disputes the factual contentions contained in ¶ 13 and clarifies for the Court that the document Defendants cite to does not actually support their facts and Plaintiff assumes Defendants are referring to [DOC 78-3] at COR-Reali000146. Plaintiff adds that Defendant Strohm noted she would have a follow up appointment with Antonio 90 days after the June 6 appointment and does not mention that she will monitor his condition in any way before that appointment. [DOC 78-3] at COR-Reali000155.

14. Plaintiff admits the factual contentions contained in ¶ 14 but clarifies that Defendant Strohm ordered a baseline EKG on June 7, 2017, not June 8, 2017. [DOC 78-3] at COR-Reali000148.

15. Plaintiff admits the factual contentions contained in ¶ 15.

16. Plaintiff admits the factual contentions contained in ¶ 16.

17. Plaintiff admits the factual contentions contained in ¶ 17.

18. Plaintiff admits the factual contentions contained in ¶ 18.

19. Plaintiff admits the factual contentions contained in ¶ 19 and clarifies that his blood pressure was elevated at 162/108. *See Dr. Alon Steinberg's affidavit*, attached hereto as Exhibit 1 at ¶ 14 *and Madeline LaMarre's Affidavit*, attached hereto as Exhibit 2 at ¶ 15.

20. Plaintiff admits the factual contentions contained in ¶ 20 but clarifies the order of Clonidine was a single dosage.

21. Plaintiff admits the factual contentions contained in ¶ 21.

22. Plaintiff admits the factual contentions contained in ¶ 22.

23. Plaintiff disputes that he denied having any chest pain or shortness of breath. Medical notes cited by Defendants do not reflect any denial of symptoms. To the contrary, Antonio arrived at the medical unit claiming he was "having 'heart problems'" and that his "blood pressure is high." [DOC 78-3] at COR-Reali000142.

24. Plaintiff admits the factual contentions contained in ¶ 24 and adds that his blood pressure reading was 144/96, which is elevated. Ex. 1 at ¶ 16; Ex. 2 at ¶ 17.

25. Plaintiff admits the factual contentions contained in ¶ 25 but adds that his blood pressure was in fact elevated and Plaintiff is not a medical professional. Ex. 1 at ¶ 16; Ex. 2 at ¶ 17.

26. Plaintiff admits the factual contentions contained in ¶ 26.

27. Plaintiff admits the factual contentions contained in ¶ 27 but points out that he had been assessed by medical services three times that week, including two days earlier for a complaint of heart problems. [DOC 78] at Undisputed Material Fact ("UMF") ¶¶ 17-21. Further, on June 21, his blood pressure was still elevated at 137/94. [DOC 78-3] at COR-Reali000141; Ex. 1 at ¶ 19.

28. Plaintiff disputes the exam conducted on June 21, 2017 was more detailed than the prior health assessment conducted by medical staff. *Compare May 31, 2017 intake by Steven Gomez*, [DOC 78-3] at COR-Reali000108-114, *with June 21, 2017 physical exam, id.* at COR-Reali000116-121, *in which answers are almost exactly identical*. Additionally, the June 21, 2017 exam form was not accurate, as it indicated Plaintiff did not have a history of hypertension (high blood pressure) even though medical staff had reported elevated blood pressure on six separate occasions before June 21, 2017 [DOC 78-3] at COR-Reali000123; Ex. 1 at ¶¶ 14, 16, 17, 19,

29. Plaintiff admits the factual contentions contained in ¶ 29.

30. Plaintiff admits the factual contentions contained in ¶ 30 and adds that he immediately lay on the floor in pain once he entered the medical unit and his blood pressure was dangerously elevated at 174/130. [DOC 78-3] COR-Reali000137; Ex. 1 at ¶ 23; Ex. 2 at ¶ 20.

31. Plaintiff admits the factual contentions contained in ¶ 31 and adds that his blood pressure was dangerously elevated. [DOC 78-3] at p. 34; Ex. 1 at ¶ 23.

32. Plaintiff disputes that notes referenced by Defendants (COR-Reali000137 and -136) reflect two separate visits with Ms. Mook. *Compare electronic progress note entered on July 1, 2017 at 8:03 PM for medical visit 9:46 AM*, [DOC 78-3] at COR-Reali000137, *with electronic progress note entered on July 1, 2017 at 8:05 PM for medical visit at 9:52 AM, just 6 minutes later*. [DOC 78-3] at COR-Reali000136. Plaintiff clarifies that the single visit from the morning generated a written note (COR-Reali000151-152) and two electronic progress notes (COR-Reali000136 and -

137), entered that evening by Ms. Mook two separate times because his vitals were taken twice. Plaintiff adds that Ms. Mook's notes from this July 1, 2017 visit indicate he arrived in medical with complaints of chest pain so intense he rated it an 8/10 on a pain scale, he laid on the floor, and was pale. [DOC 78-3] at COR-Reali000151. Further, Ms. Mook noted that his symptoms warranted an "urgent intervention" because of his abnormal vital signs (blood pressure of 174/30) and abnormal EKG. *Id.* at COR-Reali000152. She noted that his severe chest pain improves if he vomits or lies down and that he had a history of at least three prior Myocardial Infractions ("MI"). *Id.* at COR-Reali000151. Plaintiff's symptoms and diagnostic findings warranted an emergency transfer to the hospital. Ex. 1 at ¶ 24; Ex. 2 at ¶¶ 22-23; *See generally Rule 56(d) Affidavit,* attached hereto as Exhibit 3.

33. Plaintiff admits the factual contentions contained in ¶ 33 but clarifies that his pain had been so intense that he rated it an 8/10 on a pain scale and that his blood pressure was still dangerously elevated when the pain subsided. [DOC 78-3] at COR-Reali000137, -138, -151; Ex. 1 at ¶ 23; Ex. 2 at ¶¶ 21, 22.

34. Plaintiff admits the factual contentions contained in ¶ 34 and adds that his abnormal EKG required "urgent intervention" and contacting a practitioner. [DOC 78-3] at COR-Reali000152. Further, he should have been rushed to the hospital immediately after his EKG returned "abnormal." Ex. 1 at ¶¶ 24-25; Ex. 2 at ¶ 23; *See generally* Ex. 3.

35. Plaintiff admits the factual contentions contained in ¶ 35 but adds that the EKG was performed on July 1 and only read by Defendant Strohm the following day on July 2. [DOC 78-3] at COR-Reali000202.

36. Plaintiff admits the factual contentions contained in ¶ 36 but states that the appropriate medical response was an emergency transfer to the hospital. Ex. 1 at ¶¶ 24-25; Ex. 2 at ¶ 23. *See generally* Ex. 3.

37. Plaintiff admits the factual contentions contained in ¶ 37 but adds that at this point Plaintiff should have been transferred to a hospital for assessment of possible acute coronary syndrome. Ex. 1 at ¶ 25; Ex. 2 at ¶ 23; *See generally* Ex. 3.

38. Plaintiff admits the factual contentions contained in ¶ 38 but clarifies he was seen by Defendant Salazar in response to a medical emergency called[1] because of Plaintiff's emergent condition. [DOC 78-3] at COR-Reali000134. Plaintiff adds that he had been asking to go to medical for a very long time, and a medical emergency was finally called when Plaintiff collapsed on the floor of his pod in pain. [DOC 64-3] at ¶ 17; [DOC 64] at AMF ¶ N. Plaintiff even told medical staff when they arrived that "I told [the pod officer] I needed to go to medical earlier, I could have made it." [DOC 78-3] at COR-Reali000134. Plaintiff adds that he was taken to medical in a wheelchair after he was finally able to move. *Id*. Plaintiff adds he was in so much pain he thought he was going to vomit and that his blood pressure was dangerously high at 188/110. *Id*; Ex. 1 at ¶ 27; Ex. 2 at ¶ 25.

39. Plaintiff admits the factual contentions in ¶ 39 and adds that he did not want anyone to touch him because of his severe pain and that he had been in pain for at least 20 minutes before any medical staff responded. [DOC 64-3] at ¶¶ 17-20.

---

[1] Plaintiff suffered for an extended period of time before detention staff contacted medical staff, as described in detail in briefing in Plaintiff's Response in Opposition to Defendants' Board of County Commissioners for the County of Doña Ana, Christopher Barela, Kevin Silva and Chad Hill's Motion for Summary Judgment [DOC 64]. Plaintiff's condition had worsened by the time he was finally seen by medical staff following this delay.

40. Plaintiff disputes that his pain was starting to subside and points out that his pain was so intense that he thought he was going to vomit. [DOC 78-3] at COR-Reali000134. Further, he described to Defendant Salazar that he was experiencing an "intense pain." *Id*.

41. Plaintiff admits the factual contentions in ¶ 41 but states that at this point he should have been taken to the hospital immediately. Ex. 1 at ¶ 28; Ex. 2 at ¶ 26; *See generally* Ex. 3.

42. Plaintiff admits the factual contentions in ¶ 42 but states that at this point he should have been taken to the hospital immediately instead of being scheduled for a follow up appointment. Ex. 1 at ¶ 28; Ex. 2 at ¶ 26; *See generally* Ex. 3.

43. Plaintiff admits the factual contentions in ¶ 43 and adds that the borderline EKG combined with dangerously high blood pressure (188/110) and chest pain required immediate emergency transport to the hospital. Ex. 1 at ¶ 28; Ex. 2 at ¶ 26; *See generally* Ex. 3.

44. Plaintiff admits the factual contentions in ¶ 44 and adds that these results were consistent with an abnormal EKG reading. Ex. 1 at ¶ 27.

45. Plaintiff admits the factual contentions in ¶ 45 and that these results were consistent with an abnormal EKG reading. Ex. 1 at ¶ 31.

46. Plaintiff admits he was seen by Defendant Strohm on the morning of June 2 but clarifies for the Court that Mr. Reali was seen for a single assessment, which included the above EKG results, rather than several discrete assessments. *See* [DOC 78-3] COR-Reali000196, -194, -133.

47. Plaintiff admits he was "complaining of pain" and states he arrived in medical yelling "don't touch me! Oh it hurts" and was kicking, hollering and screaming from his pain. [DOC 78-3] COR-Reali000133. Plaintiff admits his pain finally resolved but states that he required emergency transport to a hospital for treatment. Ex. 1 at ¶ 32; *See generally* Ex. 3.

48. Plaintiff admits the factual contentions contained in ¶ 48.

49. Plaintiff admits Defendant Strohm diagnosed Plaintiff as being "asymptomatic" and having "anxiety" but disputes the accuracy of that assessment. In fact, Plaintiff was experiencing symptoms such as severe chest pain, restlessness, yelling and irritability, and had been in medical for chest pains twice in the prior 24 hours. [DOC 78-3] at COR-Reali000122. In addition to his symptoms, Plaintiff's vitals and diagnostics were extremely abnormal, including blood pressure of 160/90 and abnormal EKG results, consistent with high-risk unstable angina. Ex. 1 at ¶ 31. Defendant Strohm's assessment of anxiety is evidence of her indifference to Plaintiff's serious, emergent medical condition. Ex. 1 at ¶¶ 32-34, 44; Ex. 2 at ¶ 33.

50. Plaintiff admits the factual contentions contained in ¶ 50 but disputes that his prior complaints had been resolved, as he was back in medical for the third time in just 24 hours complaining again of severe chest pain. [DOC 78-3] at COR-Reali000122.

51. Plaintiff admits the factual contentions contained in ¶ 51 and adds that he needed to go to the hospital immediately. Ex. 1 at ¶¶ 32, 34; Ex. 2 at ¶ 33; *See generally* Ex. 3.

52. Plaintiff disputes that he was asymptomatic at the time of her evaluation and adds that he was experiencing symptoms such as severe chest pain, restlessness, and irritability. [DOC 78-3] at COR-Reali000133.

53. Plaintiff admits the factual contentions contained in ¶ 53.

54. Plaintiff admits the factual contentions contained in ¶ 54.

55. Plaintiff admits the factual contentions contained in ¶ 55.

56. Plaintiff admits the factual contentions contained in ¶ 56 but disputes the implication that his condition actually was monitored. *See generally [DOC 78-3] COR-Reali000131-132 in which there are no records regarding any monitoring of Plaintiff's condition until he collapses unconscious on July 3.*

57. Plaintiff admits the factual contentions contained in ¶ 57 and adds that his chest pain was so severe that a "Code Mary" medical emergency was called after Plaintiff had already been complaining of severe pain for hours. [DOC 78-3] COR-Reali000131; [DOC 64-3] at ¶¶ 21-39. When Plaintiff finally arrived in medical, he was clutching his chest, confused and scared, stating "It hurts, what's happening to me," restless, in distress, and hyperventilating. [DOC 78-3] COR-Reali000131. He quickly lost consciousness, control of his bladder and bowel, and started seizing. *Id*.

58. Plaintiff admits the factual contentions contained in ¶ 58.

59. Plaintiff admits the factual contentions contained in ¶ 59 but adds that the ambulance was not actually called until 3:48, a full 10 minutes after a medical emergency was called in Gulf pod [DOC 64-6] at p. 2. Plaintiff adds that an ambulance should have been called 2 days earlier when his severe chest pain became extremely concerning. Ex. 1 at ¶¶ 20, 24; Ex. 2 at ¶ 23. *See generally* Ex. 3.

60. Plaintiff admits the factual contentions contained in ¶ 60 and adds that Plaintiff was not taken to the hospital until 4:24 AM. [DOC 64-6] at p. 2.

61. Plaintiff admits the factual contentions contained in ¶ 61 and adds he received Ativan 13 minutes after the medical emergency was called. [DOC 78-3] at COR-Reali000131.

62. Plaintiff admits the factual contentions contained in ¶ 62 and adds that Defendant Miller did not start CPR until 21 minutes after the medical emergency was called and 13 minutes after he lost consciousness. [DOC 78-3] at COR-Reali000131.

63. Plaintiff disputes he was transported to the hospital at 4:10 A.M. and states that he was transported at 4:24 A.M, 50 minutes after the medical emergency was called. [DOC 64-6] at p. 2.

Plaintiff admits the EMTs gave him Narcan but disputes that this information is relevant to the medical care Defendants provided to Plaintiff.

64. Plaintiff disputes he was transported to the hospital at 4:20 A.M. and states that he was in fact transported at 4:24 A.M, 50 minutes after a medical emergency was called. [DOC 64-6] p. 2.

65. Plaintiff disputes this information is relevant to the medical care he received by Defendants but admits the factual contentions contained in ¶ 65.

66. Plaintiff admits the factual contentions contained in ¶ 66.

67. Plaintiff admits the factual contentions contained in ¶ 67.

68. Plaintiff admits the factual contentions contained in ¶ 68 and emphasizes that no other medical care was provided to Plaintiff by Defendants Salazar and Miller other than what was documented in his medical file [DOC 78-3].

### III.    PLAINTIFF'S ADDITIONAL MATERIAL FACTS

A.  Antonio Reali had been under the care of Corizon medical staff since he arrived at DACDC on May 31, 2017. *See generally* [DOC 78-3].

B.  At intake, Antonio told Corizon nurse Steve Gomez that he had a history of heart attacks and seizures, including both a heart attack and a seizure within the last 6 months. *Id*. at COR-Reali000110.

C.  On June 6, 2017 Family Nurse Practitioner ("FNP") Defendant Strohm saw Antonio in a Chronic Care Clinic appointment and noted his history of Coronary Artery Disease ("CAD"), seizures and chest pain. [DOC 78-3] at COR-Reali000154.

D.  Defendant Strohm also noted Antoni's chest pain caused him to "pass[] out from pain" and that he "sometimes vomits." *Id*.

E.   She determined he could be sent back to his cell and ordered a follow up for an entire 90 days from that visit. *Id* at COR-Reali000155.

F.   Antonio saw Defendant Salazar for his chest pain on June 17, 2017. *Id*. at COR-Reali000143.

G.   Defendant Salazar noted Antonio's blood pressure was 162/108, which is elevated. Ex. 1 at ¶ 14; Ex. 2 at ¶ 15.

H.    It is common sense and commonly known among medical providers that chest pain should always be taken seriously and treated immediately. Ex. 1 at ¶ 39; *See generally* Ex. 3.

I.   Any person experiencing symptoms of a potential heart attack must be sent to the hospital immediately. Ex. 2 at ¶ 41; *See generally* Ex. 3.

J.    Instead, Defendant Strohm, familiar with Antonio's history of chest pain and heart problems, and the seriousness of chest pain, advised Defendant Salazar to only treat his high blood pressure with a single dose of Clonidine. [DOC 78-3] at COR-Reali000123.

K.   On June 19, Antonio complained of "heart problems" and his blood pressure was 144/96, which is elevated. *Id*; Ex. 1 at ¶ 16.

L.    Antonio's blood pressure remained elevated for the next several days without appropriate control or any treatment plan. [DOC 78-3] at COR-Reali000122-123; Ex. 1 at ¶ 17; Ex. 2 at ¶ 18.

M.   A patient with a history of heart disease should have his blood pressure under better control. Ex. 1 at ¶ 17.

N.   By the morning of July 1, 2017, Antonio's condition had gotten so bad that when he entered the medical unit, he lay on the ground in pain. [DOC 78-3] at COR-Reali000122; Ex. 1 at ¶ 21.

O.   Nurse Andrea Mook noted that his pain was an 8/10 on a pain scale and that he looked pale. [DOC 78-3] at COR-Reali000151; Ex. 1 at ¶ 21.

13

P.   Antonio's blood pressure was 174/130, which is dangerously high. [DOC 78-3] at COR-Reali000122; Ex. 1 at ¶ 23.

Q.   Defendant Strohm was advised of his condition and decided again to only treat his high blood pressure and order an EKG to be performed. [DOC 78-3] at COR-Reali000148.

R.   The EKG revealed "new ST depression in anterior-lateral leads consistent with ischemia." Ex. 1 at ¶ 22.

S.   This EKG reading combined with his elevated blood pressure were signs of a potential heart attack and warranted an immediate emergency transfer to the hospital. Ex. 1 at ¶ 24; Ex. 2 at ¶ 23; *See generally* Ex. 3.

T.   Instead of being taken to the hospital for assessment of possible acute coronary syndrome or heart attack, Defendant Strohm allowed Antonio to be sent back to his cell with a single dose of clonidine. Ex. 1 at ¶ 25; Ex. 2 at ¶ 21.

U.   Later that same night, Antonio collapsed from the intense pain in his chest and a medical emergency was called in his pod. [DOC 78-3] at COR-Reali000134.

V.   He had to be taken to medical in a wheelchair to be seen by Defendant Salazar. *Id.*

W.   Defendant Salazar took Antonio's vitals and noted his dangerously high blood pressure of 188/110 and abnormal EKG results showing "nonspecific lateral ST changes." [DOC 78-3] at COR-Reali000134; Ex. 1 at ¶ 27.

X.   Yet again, Mr. Reali's pain, blood pressure, and EKG results required emergency transport to the hospital for evaluation and treatment. Ex. 1 at ¶ 28; Ex. 2 at ¶ 26; *See generally* Ex. 3.

Y.   Despite two episodes of abnormal vital signs, severe chest pain and abnormal EKG readings in one day, Defendant Strohm ordered for Antonio to receive blood pressure medication and be sent back to his pod. [DOC 78-3] COR-Reali000134; Ex. 1 at ¶ 28; Ex. 2 at ¶ 26.

Z.  The next morning, Antonio suffered extreme chest pain again and was seen by Defendant Strohm. [DOC 78-3] at COR-Reali000133; Ex. 1 at ¶ 30.

AA.    Defendant Strohm noted that his blood pressure was 160/90 and deemed that his vitals were "stable" even though this is an elevated blood pressure. [DOC 78-3] at COR-Reali000133; Ex. 1 at ¶ 31; Ex. 2 at ¶ 28.

BB.    Defendant Strohm noted he had a history of chest pain, including "2 similar episodes" to this one just the night prior and earlier that morning. [DOC 78-3] COR-Reali000133.

CC.    In fact, this was the fifth time since he was booked into the jail only 31 days earlier that Antonio had seen medical staff for extreme chest pain. [DOC 78-3] at COR-Reali000122-123.

DD.     Defendant Strohm ordered 2 EKGs for Antonio, and both returned abnormal results, consistent with high-risk unstable angina. [DOC 78-3] at COR-Reali000194, -196; Ex. 1 at ¶ 31; Ex. 2 at ¶¶ 29-31.

EE. Antonio's diagnostic results combined with his pain, vitals, and persistently concerning symptoms over the past several weeks required immediate emergency transport to a hospital. Ex. 1 at ¶ 32; Ex. 2 at ¶ 33; *See generally* Ex. 3.

FF. Instead, Defendant Strohm assessed Antonio to be experiencing "anxiety" and ordered a single dose of Clonidine, then returned him to his cell. [DOC 78-3] at COR-Reali000133; Ex. 1 at ¶ 33; Ex. 2 at ¶ 32.

GG.    An assessment of anxiety in the face of Antonio's history and active symptoms and failure to send Antonio to the hospital was unwarranted and demonstrated gross indifference. Ex. 1 at ¶ 34; Ex. 2 at ¶ 33.

HH.     Late that night, Antonio began experiencing severe chest pain again. [DOC 64-3] at ¶ 21.

II.  Finally, late into the morning hours of July 3, a medical emergency was called for the second time in less than 48 hours. [DOC 78-3] at COR-Reali000131.

JJ.  Antonio clutched his chest stating: "it hurts, what's happening to me" at 3:38 AM. *Id*.

KK.     At this point, despite Antonio experiencing an obvious medical emergency, no one called 911. *Id*; Ex. 1 at ¶¶ 39-40.

LL.  After being unable to breathe for some time, Antonio lost consciousness, control of his bladder and bowel, and started seizing at 3:42 AM. [DOC 78-3] at COR-Reali000131.

MM.     An ambulance should have been called immediately. Ex. 2 at ¶ 36.

NN.     Still, an ambulance was not called by Defendants Salazar or Miller. [DOC 78-3] at COR-Reali000131.

OO.     Finally, 10 minutes after Antonio's emergent symptoms and after he arrested, an ambulance was called at 3:48 AM. [DOC 64-6] at p. 2.

PP. This delay in contacting emergency services was unacceptable. Ex. 2 at ¶ 37.

QQ.     Thirteen (13) minutes after Antonio lost consciousness, Defendant Miller began CPR, at 3:55 a.m. [DOC 78-3] at COR-Reali000131.

RR.     Anotnio's recurrent symptoms were consistent with a clear unstable cardiac pattern. Ex. 1 at ¶ 41.

SS.  Jail medical staff are equipped to provide primary care and minminal secondary to inmates. Ex. 2 at ¶ 40.

TT.  Any symptoms requiring a higher level of care, including possible symptoms of a heart attack, should be immediately referred to a hospital. Ex. 2 at ¶¶ 40-41; *See generally* Ex. 3.

UU.     Having worked in the jail, Defendants must have been aware of the limits of care they could provide. Ex. 2 at ¶ 40.

VV.        Defendants Strohm, Salazar and Miller were aware of Antonio's recurrent severe sypmtoms and, instead of treating him, provided scant care, effectively ignorning his recurrent symptoms and EKG abnormalities. Ex. 1 at ¶¶ 43-44; Ex. 2 at ¶¶ 43-45.

## IV.    LEGAL STANDARDS

### A.  Summary Judgment Standard

Plaintiff hereby incorporates the summary judgment standards set forth in his Response to the County Defendants' Motion for Summary Judgment on the Basis of Qualified Immunity [Doc. 64] pursuant to D.N.M.LR-Civ. 7.1(a).

### B.  Qualified Immunity Standard

Plaintiff hereby incorporates the qualified immunity standards set forth in his Response to the County Defendants' Motion for Summary Judgment on the Basis of Qualified Immunity [Doc. 64] pursuant to D.N.M.LR-Civ. 7.1(a).

## V.    ANALYSIS

### A.  Corizon Defendants do not enjoy the privilege of qualified immunity.

Defendants ask the Court to expand the doctrine of qualified immunity to a private actor, in an area where this privilege has not historically existed. The Supreme Court has carved out areas of immunity from suit where the tradition of immunity was so firmly rooted in the common law and supported by strong policy reasons. *See e.g., Richardson v. McKnight*, 521 U.S. 399 (1997). Other circuits have recognized that when determining whether or not qualified immunity is available to a private party, no matter if they are a private person working part-time for the government (as the defendant in *Filarsky v. Delia*, 132 S.Ct. 1657, 566 U.S. 377 (2012)) or a private medical provider providing care to a prison, the analysis remains the same. *See e.g., McCullum v. Tepe*, 693 F.3d 696 (6th Cir. 2012).  In certain circumstances, qualified immunity

may be granted to private actors who dabble in governmental work, under the supervision and direction of a government entity. *See e.g.*, *Filarsky*. The Supreme Court has determined that private entities "systematically organized to assume a major lengthy administrative task (managing an institution) with limited direct supervision by the government, undertakes that task for profit and potentially in competition with other firms," do not enjoy the defense of qualified immunity. *Richardson*, at 413.

Throughout the United States, in Circuits that have addressed the issue, it is widely agreed that qualified immunity does not extend to private medical providers working in prisons. *See e.g., Shields v. Illinois Dept. of Corrections*, 746 F.3d 782 (7th Cir. 2014) (holding private medical providers are similarly barred from asserting qualified immunity, similar to private prison officials); *Cook v. Martin*, 148 Fed. Appx. 327 (6th Cir. 2005) (holding "the history and purposes of qualified immunity does not reveal anything sufficiently special about the work of private prison medical providers that would warrant providing such providers with governmental immunity"); *Harrison v. Ash*, 539 F.3d 510 (6th Cir. 2008) ("the history and purpose of qualified immunity, as well as the case law interpreting the scope of the doctrine, are clear that [the privately employed jail nurses] are not eligible for qualified immunity in a § 1983 suit."); *Jensen v. Lane*, 222 F.3d 570 (9th Cir. 2000) (holding a private psychiatry group was not entitled to qualified immunity because of its vulnerability to market pressures); *Hinson v. Edmond*, 192 F.3d 1342 (11th Cir. 1999) (denying a private medical provider from advancing the defense of qualified immunity because no strong reason appeared to distinguish between privately employed prison guards and privately employed prison physicians."); *McCullum v. Tepe*, 693 F.3d 696 (6th Cir. 2012) (holding a privately paid prison psychiatrist could not assert a defense of qualified immunity); *Currie v. Chhabra*, 728 F.3d 626 (7th Cir. 2013) (finding the defense of qualified immunity was not

applicable to the private medical provider defendant working in the jail). Allowing Corizon and its employees to advance this defense goes against the rule set out by the Supreme Court in *Richardson v. McKnight* and expands the doctrine of qualified immunity into an area it was never intended.

The Supreme Court recognized that the purpose of qualified immunity is to protect the ability of government to "serve the public good or to ensure that talented candidates [are] not deterred by the threat of damages suits from entering public service." *Richardson*, at 408. The law of qualified immunity, of course, looks differently on private entities than it does on public ones because they "act within a *different* system." *Richardson*, at 410 (italics in original). Private firms are subject to ordinary marketplace pressures that "provide…strong incentives to avoid overly timid, insufficiently vigorous, unduly fearful, or 'nonarduous' employee job performance." *Id*. at 401. These firms also have the ability to avoid deterring talented candidates through use of, for example, insurance coverage and indemnification. *Id*. at 411.

Even though the *Richardson* Court made its decision narrowly, Defendants fall directly within the confines of the Court's analysis. Corizon is "systematically organized to assume [the] major, lengthy task" of providing medical and psychiatric services throughout the New Mexico Corrections Department with "limited direct supervision by the government," undertaking that task for profit in competition with other firms. *Id*. At 413.

Corizon touts itself as the "foremost provider of correctional healthcare in the United States," according to its website[2]. It has "approximately $800 million in revenue" and "employs over 5,000 staff."[3] It provides medical care, including psychiatric care, to prisons and jails

---

[2] http://www.corizonhealth.com/index.php/S=0/About-Corizon/Who-We-Are-History-and-Today
[3] http://www.corizonhealth.com/Corizon-News/flacks-group-acquires-corizon-health-premier-correctional-healthcare-us

throughout the country, and (until May 31, 2016) contracted with the New Mexico Corrections Department (NMCD). Although Corizon has lost its contract with the Department of Corrections amidst multiple lawsuits, scant oversight by NMCD, and a bidding war with other contractors[4], it continues to provide care to jails across the state. Of course, one of these jails is the Doña Ana County Detention Center. Because Corizon has organized itself to assume these major, lengthy tasks for profit in a competitive marketplace, they have no basis to assume they would enjoy qualified immunity.

Importantly, Corizon operates against "pressure from potentially competing firms who can try to take its place." *Richardson*, at 410. Corizon has in fact fallen victim to the pressures envisioned in *Richardson*, and has lost its contract with the New Mexico Corrections Department, replaced by Centurion, another private correctional healthcare company, on June 1, 2016[5] and has since fallen from providing care at 301 facilities across 22 states to only 220 facilities across 17 states[6]. Despite this fall, Corizon continues to operate across the country in jails and prisons providing medical care with enormous financial success.

Corizon is organized in whole to provide correctional healthcare, not dabble in it. It has aligned itself in a position to not only accept government contracts when they are presented, but actually seek them out. In *Filarsky v. Delia*, the Supreme Court reasoned:

> [t]o the extent such private individuals do not depend on the government for their livelihood, they have freedom to select other work—work that will not expose them to liability for government actions. This makes it more likely that the most talented candidates will decline public engagements if they do not receive the same immunity enjoyed by their public employee counterparts."

---

[4] https://www.santafenewmexican.com/news/local_news/new-mexico-seeks-better-oversight-of-prison-health-contract/article_a7e30edf-7d84-520e-b90a-daf59da96cd6.html
[5] https://www.centurionmanagedcare.com/newsroom/centurion-healthcare-newmexico.html
[6] Corizon's website in 2016 previously reflected a presence in 301 facilities across 22 states in 2016, which was reflected in previous briefing by counsel in *Marquez v. The GEO Group, Inc., et al.*, 1:16-CV-01259 JB/SCY [DOC 39]. Corizon's website currently indicates it provides care at 220 facilities across 17 states. http://www.corizonhealth.com/About-Corizon/Locations

132 S.Ct. 1657, 566 U.S. 377, 390 (2012). It is unlikely (probably impossible) that Corizon will decline public engagement if it did not enjoy the same immunities as public employees. Corizon will continue providing its medical expertise despite the fact it does not enjoy qualified immunity because that is what it has designed itself to do.

In fact, Corizon currently does, or has done, business in Circuits that *explicitly* deny qualified immunity to private medical providers in prisons, including the Sixth, Seventh, Ninth, and Eleventh Circuits. *Supra*. The Tenth Circuit had an opportunity to address this issue in *Kellum v. Mares*, 657 Fed. Appx. 763 (10th Cir. 2016), after District Court Judge Brack denied a private medical provider's attempt to raise the defense of qualified immunity, in the jail context. The Tenth Circuit affirmed the lower court's decision denying the provider's motion to dismiss without affirmatively deciding whether the defense could be raised by a private medical provider in a jail or prison. *Id*. n. 3.

Recently, in *Tanner v. McMurray*, this district allowed another private medical provider to enjoy the defense of qualified immunity. 429 F.Supp.3d 1047 (D.N.M. 2019). In support of this decision, the court relied in large part on a Tenth Circuit case granting immunity to a doctor who was contracted by the government to provide a lethal injection at an execution. *The Estate of Lockett by & through Lockett v. Fallin*, 841 F.3d 1098, 1107 (10th Cir. 2016). The Court in that case likened the doctor to the contracted attorney in *Filarsky* who merely dabbled in government work, holding he was entitled to qualified immunity because "he was a private party hired to do a job for which a permanent government employee would have received qualified immunity." *Id*. at 1109. This is an over-simplification of the qualified immunity analysis laid out in *Richardson*. If the Supreme Court would have simply analyzed whether the guards in *Richardson* would have been entitled to the privilege of qualified immunity if they were government workers, the analysis

in this and every case involving a private actor would be simple; they all would enjoy qualified immunity (including the guards in *Richardson*). Of course, the Supreme Court did not extend the privilege to the guards in *Richardson* and instead took great care to carefully evaluate their entitlement.

Corizon does not dabble in government work. Corizon fits the mold carved out in *Richardson*. It is organized to manage medical care of institutions across the country for profit, in competition with other firms, subject to market pressures. *See Richardson*. Corizon has not been dissuaded by the lack of immunity and continues to do business on a large scale throughout the United States. As a result, Corizon and its employees should not be granted the same immunity as government actors.

**B. Even if Defendants *could* raise this defense, they would not be entitled to qualified immunity.**

Even if Defendants *could* raise qualified immunity, they violated clearly established constitutional rights while Antonio was at DACDC. Antonio, like all prisoners and pretrial detainees[7] had the constitutional right to receive *adequate medical care.* It has long been established that prison officials may not act with deliberate indifference to a serious and obvious medical need of a person under their care. *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285 (1976). For Plaintiff to prevail on such a claim he must first prove that his condition was objectively sufficiently serious. In this instance, the analysis is uncontroversial. Common sense tells us that severe chest pains are associated with a life-threatening condition. In addition to being common sense, courts have long recognized that chest pain is an obvious symptom of a serious medical condition, like heart attack. *See e.g.*, *Sealock v. Colorado*, 218 F.3d 1205 (10th Cir. 2000) (finding

---

[7] As Defendants explain in their Motion, the deliberate indifference analysis is the same under both the Eighth and Fourteenth Amendment standard. Defendants also agree Plaintiff was a pretrial detainee at the time of the events alleged, meaning his claims arise under the Fourteenth Amendment. [Doc. 78] at p. 10.

evidence that the plaintiff suffered severe chest pain reasonably believed to be a heart attack sufficiently established the objective prong of the deliberate indifference test); *Mata v. Saiz*, 427 F.3d 745 (10th Cir. 2005) ("severe chest pain, a symptom consistent with a heart attack, is a serious medical condition under the objective prong of the Eighth Amendment's deliberate indifference standard").

When a provider is confronted with such an obvious sign of a medical emergency, the provider *must* either (1) adequately treat the condition, or (2) fulfill his or her gatekeeper role "for other medical personnel capable of treating the condition." *Sealock*, at 1211. The Supreme Court has further held that indifference can be shown where a provider intentionally denies **or delays** access to medical care. *Estelle v. Gamble*, 429 U.S. 97, 104–05, 97 S. Ct. 285, 291, 50 L. Ed. 2d 251 (1976). Even a brief delay in care can prove a guard's indifference. *Mata* at 755. There is no requirement the providers had some "express intent to harm." *Mata v. Saiz,* 427 F. 3d 745, 752 (10th Cir. 2005). It is enough for a plaintiff to show that "an official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id*. (*quoting Farmer,* 511 U.S. at 842).

Once a sufficiently serious medical condition exists, it is necessary to analyze what the medical professionals did in response to it. The defendants argue their behavior, although possibly negligent, did not rise to the level of a constitutional violation. However, the facts tell a different story. Throughout Plaintiff's detention in 2017, he suffered frequent bouts of chest pain. [DOC 78] at UMF ¶¶ 17, 22, 30, 38, 39, 46, 47, 57. Corizon medical staff knew Antonio had a history of heart disease and recent heart attack, in addition to his other serious medical conditions. *See Plaintiff's Additional Material Fact ("AMF")* ¶¶ B, C. Antonio also directly told Defendant Strohm of his history when she saw him for evaluation of his Coronary Artery Disease (CAD) less than a week after entering the facility. AMF ¶ B. Specifically, Antonio expressed the severity of

his heart condition, explaining he experienced chest pain which can only be relieved by "dropping to the ground" or "deep breathing," but "sometimes vomits" or "passes out from pain." AMF ¶ D; [DOC 78-3] COR-Reali000154-155. Throughout the month of June, Corizon staff saw Antonio for his severe chest pain and noted dangerously elevated blood pressures. AMF ¶¶ G, K, L.

By July 1, 2017, it became clear Antonio required emergency medical care. AMF ¶¶ N, S. Early that morning, Antonio was seen in medical for chest pain, which he rated an 8/10 on the pain scale. AMF ¶ O. Staff noted Antonio was pale, experiencing dangerously elevated blood pressures (174/130 and 170/110), and abnormal EKG results. AMF ¶¶ O, P, R, S. Instead of a transfer to a hospital, Antonio was sent back to his cell with a dose of clonidine. AMF ¶ T. That evening, Antonio was seen by medical staff following a "Code Mary" (medical emergency), where he was noted to be "laying…on [the] floor, groaning" and was in so much pain he felt the need to vomit. AMF ¶ U; [DOC 78-3] COR-Reali000134. His blood pressure was dangerously elevated (188/110) and an EKG revealed nonspecific lateral ST changes. AMF ¶ W. Again, Antonio required emergency transport to the hospital. AMF ¶ X. Instead, despite life-threatening symptoms, Defendants Salazar and Strohm returned Antonio to his cell with a single dose of blood pressure medication and no further treatment. AMF ¶ Y. The following morning, Antonio returned to the medical department with chest pain and was seen by Defendant Strohm. AMF ¶ Z. Defendant Strohm noted that he was screaming, "Don't touch me! Oh, it hurts!" and laid on the floor kicking and screaming in pain. DMF ¶ 47. Antonio's blood pressure was, yet again, dangerously elevated, and the two EKGs performed revealed abnormal results consistent with high-risk unstable angina. AMF ¶ DD; Ex. 1 at ¶ 31. Defendant Strohm provided the "unwarranted and indefensible" assessment that Antonio was simply suffering from "anxiety" and ignored the obvious cardiac symptoms he was experiencing. Ex. 1 at ¶ 34; AMF ¶¶ FF, GG. Yet again, Defendant Strohm

ordered a single dose of blood pressure medication and returned him to his cell. AMF ¶ FF. Early in the morning on July 3, 2017, jail staff again called a "Code Mary" and escorted Antonio to the medical department. When he arrived, he was yelling, "It hurts! What's happening to me?" Medical staff noted he was grunting, yelling, hyperventilating, and was clearly in distress. AMF ¶¶ II, JJ; DMF ¶ 57. Eventually, Antonio told staff that he could not breathe, then lost consciousness, fell into a seizure, and lost bladder and bowel control. AMF ¶¶ LL. Eventually, 10 minutes after the Code Mary was called, emergency medical services were contacted. AMF ¶ OO.

Even a lay person would recognize the symptoms Plaintiff was suffering demanded transport to a local hospital. You do not need to be a medical expert to know a blood pressure reading of 188/110 is a life-threatening condition. You do not need to have specialized medical training to know that a person with a history of heart attacks who is complaining of persistent chest pains needs to be evaluated by a cardiologist. In fact, no training is required to call for an ambulance when someone with Plaintiff's history has abnormal EKG results coupled with chest pain and life-threatening high blood pressure. If such a person presented to a community Urgent Care facility, they would be transported immediately to the local emergency room. What is truly frightening is that Plaintiff knew this as he begged for medical care. Yet he was repeatedly sent back to his cell instead of to a hospital. Such a decision can only be found in jails and prisons. It is the kind of indifference that our society reserves only for those who are imprisoned.

Antonio's physical symptoms, dangerous diagnostic results, and abnormal vitals were clear evidence that he was experiencing a medical emergency. AMF ¶ EE. Defendants knew[8] they were unable to provide the emergency care Antonio required. In *Sealock v. Colorado*, the Tenth Circuit

---

[8] Although it is common sense that the jail medical staff was unable to provide hospital level care to a patient exhibiting symptoms of a heart attack, depositions of the Corizon staff will confirm this common sense understanding for the record. *See* Exhibit 3, generally.

recognized that, on its own, the defendants' failure to summon an ambulance in the face of a patient

complaining of chest pain disregarded a serious risk to the plaintiff's heath, "arguably constituting

deliberate indifference to a serious medical need." 218 F.3d at 1211. Additionally, the defendant

physician's assistant in that case testified:

> [I]f we've got somebody with nausea, vomiting and throbbing severe chest pain,
> the red lights come on. It's time to take them to the hospital. I don't need to see
> him. I don't need to do anything more. He needs emergency at that time. Call the
> ambulance…If I would have been told those words [chest pain], then, there's just
> one thing we do…we send them, that's it…Even if they were there this morning,
> they came back, they've got more chest pain, back again.

*Id.* There is no question that Antonio should have been sent to a hospital at the first moment he

presented with chest pain and complaints of needing to vomit, combined with abnormal diagnostic

results. Defendants' failure to do so was indifferent.

Defendants knew that they lacked the resources to treat a heart attack and knew symptoms

of a possible heart attack must always be sent to a hospital and were, in fact, obligated to do so.

AMF ¶ UU; Ex. 2 at ¶¶ 40-42. The only care they provided was single doses of Clonidine to treat

Antonio's blood pressure (a mere symptom of his heart attack) without even an assessment to see

if the medication lowered his pressure. Ex. 2 at ¶ 27. This was the equivalent to giving a patient

Tylenol for a broken arm; it equates to no care at all. This is not a case of a disagreement of medical

treatment; this is a case of medical staff documenting emergent medical symptoms and refusing to

provide care until it was too late. The Constitution prohibits the "unnecessary and wanton infliction

of pain" Antonio was subjected to for weeks at DACDC. *Whitley v. Albers*, 475 U.S. 312, 318

(1986). Defendants watched and documented this pain. Their failure to send him to the hospital

can only be described as indifferent.

Deliberate indifference is not the only way to analyze this case. Recently, Courts across

the country (including the Tenth Circuit) have simplified their evaluation of inadequate medical

care cases in the context of a jail to only require pretrial detainees prove the defendants' actions were objectively unreasonable. In 2015, the Supreme Court made a further distinction between pretrial detainees whose protection stems from the Fourteenth Amendment and prisoners whose protection stems from the Eighth Amendment. In *Kingsley v. Hendrickson*, 576 U.S. 389, 135 S. Ct. 2466 (2015), the Supreme Court clarified that the subjective motivations of governmental staff had no bearing on the analysis of a Fourteenth Amendment claim in the context of excessive force used on a pretrial detainee. The Eighth Amendment's subjective analysis whereby maliciousness or the wanton infliction of pain is used to determine if the force was excessive is no longer applicable for pretrial detainees.

Over the intervening years since *Kingsley*, various circuits have interpreted *Kingsley* to apply to conditions of confinement and/or inadequate medical care claims under the Fourteenth Amendment rather than just excessive force claims[9]. *See e.g. Bruno v. City of Schenectady*, 727 Fed. Appx. 717, 720 (2d Cir. 2018) (applying *Kingsley* in the context of inadequate medical care); *Miranda v. County of Lake*, 900 F.3d 335, 352 (7th Cir. 2018) (applying the "objective unreasonableness inquiry identified in *Kingsley*" to the medical context); *Hardeman v. Curran*, 2019 WL 3774128, ----F.3d.---- (N.D.Ill. 2019) (specifically applying the objective standard to all conditions of confinement claims for pretrial detainees); *Gordon v. County of Orange*, 888 F.3d 1118 (9th Cir. 2018) and *Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) (applying *Kingsley's* standard to both medical care claims and conditions of confinement generally). This approach has also been taken by the Tenth Circuit, as seen in a recent opinion involving a pretrial detainee who was taken to a hospital in a state of nakedness. *See Colbruno v. Kessler*, 928 F.3d

---

[9] However, other circuits have read *Kingsley* more narrowly and confined its application to scenarios involving excessive force only. *See e.g. Alderson v. Concordia Parish Corr. Facility*, 848 F.3d 415, n.4 (5th Cir. 2017); *see also Whitney v. City of St. Louis*, 887 F.3d 857, 860 n.4 (8th Cir. 2018).

1155, 1163 (10th Cir. 2019) (in which the court described *Kingsley* as removing any ambiguity about whether the intent to punish a pretrial detainee was necessary in Fourteenth Amendment claims any more). Although *Colbruno* did not specifically deal with a lack of medical care, it clearly articulated that all conditions of confinement should be analyzed under an objectively reasonable standard in which the governmental official's state of mind was irrelevant to the analyses. *Id*. It is also well settled that medical care is as much a condition of confinement as "the food he is fed, the clothes he is issued, the temperature he is subjected to in his cell." *Wilson v. Seiter*, 501 U.S. 294, 303, 111 S. Ct. 2321, 2326–27, 115 L. Ed. 2d 271 (1991). Thus, the standard the Tenth Circuit articulated in *Colbruno* logically applies to cases involving inadequate medical care of a pretrial detainee.

As seen above, Plaintiff has demonstrated a constitutional violation under the older deliberate indifference standard. However, given the fact he was a pretrial detainee the court can employ the objectively unreasonable analyses described in *Kingsley*. Under this standard, the constitutional violation becomes even clearer. In today's society, we expect a person who has extremely high blood pressure, abnormal EKG readings and is experiencing excruciating chest pains having recently suffered from a heart attack, to be sent to the hospital. Anything less is objectively unreasonable even for a medical department in a jail.

**C. Disputes of material fact prohibit summary judgment in favor of the defendants.**

The parties dispute the level and amount of care Antonio received at DACDC by the medical defendants. Defendants have alleged facts that minimize or obliviate the symptoms Antonio experienced while at DACDC. Throughout their statement of facts, Defendants allege Plaintiff did not raise serious medical concerns, denied chest pains, or even presented as "asymptomatic" at several encounters with Corizon medical staff. *See e.g.*, [DOC 78] UMF ¶¶ 10,

23, 40, 52. However, at each of these encounters Antonio *did* express serious concerns and emergent and serious symptoms and medical concerns, including chest pain so severe it caused him to pass out or vomit from pain. DMF ¶¶ 10, 12. Plaintiff vehemently disputes his symptoms were minimal or that they were appropriately treated. Records provided by the defendants demonstrate that medical staff clearly documented many of Antonio's serious, life-threatening symptoms but failed to treat them. Defendants argue that the presence of medical records indicates treatment. To the contrary, medical records reflect Defendants effectively ignored Antonio's symptoms until he suffered cardiac arrest. Amazingly, nearly every vitals check revealed elevated blood pressures and nearly every EKG returned abnormal results. AMF ¶¶ G, K, L, P, R, W, AA, DD. Defendants simply noted the abnormalities and refused to provide adequate treatment.

Importantly, Defendants have exaggerated the amount of care Antonio actually received during his time at DACDC. In their description of facts, Defendants attempt to mislead the Court into believing Antonio received double to triple the care he actually did. For example, Defendants claim Plaintiff was seen for multiple medical evaluations on the date of his intake but common sense reading of the medical records shows that he was seen once by Steven Gomez, LPN which generated several written records. [DOC 78] at UMF ¶¶ 4-7; [DOC 78-3] at COR-Reali000108-114, -147. Defendants go on to claim Plaintiff was seen by Andrea Mook twice on the morning of July 1, 2017, once for complaints of chest pain and a second encounter where his pain had subsided. [DOC 78] at UMF ¶¶ 30-32. Again, records show that Ms. Mook was seen only once on the morning of July 1, 2017, generating a written record and an electronic record, not two encounters. [DOC 78-3] at COR-Reali000136-137. Defendants also misleadingly wrote their facts to lead the Court to believe Antonio was seen more than once the morning of July 2, 2017 for his chest pain. [DOC 78] at UMF ¶¶ 44-46. In fact, he was seen only once by Defendant Strohm, who

entered an electronic record of her single evaluation at 10:48 a.m. DMF ¶ 46; [DOC 78-3] COR-Reali000196, -194, and -133. Of course, in addition to the common sense understanding that a person would unlikely have several medical appointments within a single hour, by reading the electronic record, the reader can clearly see that the EKGs taken prior to 10:48 are referenced in the text, along with vitals taken that morning during the single evaluation. [DOC 78-3] COR-Reali000196, -194, and -133. Defendants flagrant attempts to mischaracterize the evidence to give the impression of overwhelming care demonstrates the clear disputes of fact in this case.

## D.  CONCLUSION

For the above stated reason, Plaintiff respectfully requests the Court **deny** Defendants David Miller, Roslyn Strohm, and Veronica Salazar's Motion for Partial Summary Judgment Based on Qualified Immunity.

Respectfully Submitted,

*/s/ Alyssa D. Quijano*
Alyssa D. Quijano
Matthew E Coyte
*Attorneys for Plaintiff*
3800 Osuna Road NE, Suite 2
Albuquerque, NM 87109
(505) 244-3030
aquijano@coytelaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 12th day of August 2020, I filed the foregoing electronically through the CM/ECF system, which caused Counsel of Record to be served by electronic means.

*/s/ Alyssa D. Quijano*
Alyssa D. Quijano