IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

ANTONIO REALI,

      Plaintiff,

v.                                                                  No. 2:19-CV-00603 MV/SMV

BOARD OF COUNTY COMMISSIONERS
FOR THE COUNTY OF DOÑA ANA, CORIZON
HEALTH, INC., CHRISTOPHER BARELA,
VERONICA SALAZAR, DAVID MILLER,
ROSLYN STROHM, KEVIN SILVA, and
CHAD HILL

      Defendants.

### AFFIDAVIT OF DR. ALON STEINBERG

1. I, Alon Steinberg, M.D., F.A.C.C., am over the age of eighteen and am competent to testify as to the matters set forth herein.

2. My testimony is based on my personal knowledge and regards matters to which I am competent to testify to.

3. I am a Board-certified Cardiologist, practicing Cardiology for over 20 years. I have been with Cardiology Associates Medical Group in Ventura, CA over the last 15 years. I have served as the Chief of Cardiology at Community Memorial Hospital in Ventura over the last 10 years, where I oversee peer review, quality measures and credentialing. I have been an expert reviewer and consultant for the Medical Board of California and have testified for state in court regarding the standard of care in Cardiology.

4. Additionally, I am a Clinical Assistant Professor for Western University Health Sciences at Community Memorial Hospital's residency teaching program.

**EXHIBIT 1**

1

5.  I have reviewed the medical records created by and provided to Corizon medical staff related to Antonio Reali's medical care at the Doña Ana County Detention Center (DACDC) between May 31, 2017 and July 3, 2017.

6.  Based on these records, it is apparent Corizon medical staff were indifferent to Mr. Reali's serious medical condition during his detention.

7.  Mr. Reali was transferred to DACDC from the Madera County Jail in California. A "Confidential Transfer of Medical Information" from the Madera County Jail was provided to Corizon medical staff at DACDC reflecting Mr. Reali's complaints of chest pain.

8.  When Mr. Reali entered DACDC, Corizon medical staff also conducted an intake screening and health history.

9.  This intake reflected a cardiac history, including a heart attack within 6 months of admission.

10.  On June 6, 2017, Mr. Reali was seen by provider Roslyn Strohm, FNP in the Chronic Care Clinic follow up for epilepsy and CAD (Coronary Artery Disease).

11.  During this appointment, Mr. Reali expressed a history of chest pain and "passes out" from pain.

12.  In response, Roslyn Strohm ordered a baseline EKG which was performed on 6/9/17 and was normal.

13.  On June 17, 2017 Mr. Reali began experiencing chest pain and was seen by Corizon registered nurse Veronica Salazar. Chest pain was brought on by emotional distress and resolved on own. No details were documented regarding description of chest pain or length of time Mr. Reali had pain.

14. During this encounter, Salazar took Mr. Reali's vitals, revealing an elevated blood pressure of 162/108.

15. In response, Salazar notified provider Roslyn Strohm over the phone. Strohm ordered a one-time dose of Clonidine to treat Mr. Reali's blood pressure and follow-up blood pressure monitoring.

16. On June 19, 2017, Mr. Reali was seen in the medical department with complaints of "heart problems." Medical staff took his vitals, which revealed an elevated blood pressure of 144/96. Medical staff "reviewed deep breathing and visualization as methods of controlling anxiety." No additional medical intervention was performed.

17. Medical staff conducted another blood pressure checks from the following two days revealed consistently elevated blood pressures of 140/87 on June 20 and 130/98 on June 21, 2017. A patient with prior heart disease should have blood pressure under better control.

18. On June 21, 2017, Mr. Reali was seen by a Corizon nurse for a health history. During this health history, staff again noted Mr. Reali's recent history of heart attack.

19. Staff again noted his elevated blood pressure at 137/94.

20. By July 1, 2017, Mr. Reali's symptomology became very concerning.

21. At 9:46 a.m. on July 1, 2017, Mr. Reali was seen again in medical for chest pain. He entered the medical department and laid on the ground. He rated his pain at an 8/10 on the pain scale.

22. EKG performed at 9:52 a.m. revealed new extensive new ST depression in anterior-lateral leads consistent with ischemia.

23. Medical staff noted a dangerously elevated blood pressure of 174/130. A repeat blood pressure was taken six (6) minutes later, which remained significantly elevated at 170/110.

24. Mr. Reali's symptoms, vital signs and new EKG ischemic findings warranted an emergency transfer to a hospital at this point. Aspirin, nitroglycerin and urgent control of his blood pressure was warranted. Evaluation and treatment in a monitored setting in a hospital was required.

25. Rather than access emergency medical care, medical staff contacted provider Roslyn Strohm via telephone. Strohm ordered a single dose of clonidine and a repeat EKG. Repeat blood pressure at 10:46 a.m. was 124/80 and repeat EKG at 10:56 had normalized. Mr. Reali was then returned to his cell. No aspirin or nitroglycerin were prescribed. No further monitoring was recommended. No medications or evaluation was recommended. No treatment plan was made. At this point Mr. Reali should have still been transferred to hospital for assessment of possible acute coronary syndrome.

26. That evening at 22:41, Mr. Reali started to have chest pain again and returned to the medical department.

27. Nurse Veronica Salazar noted Mr. Reali was laying on the floor groaning with dull intense pain to his mid sternum. Mr. Reali's blood pressure was again dangerously high, at 188/110 and EKG at 22:55 as chest pain was subsiding revealed mild nonspecific lateral ST abnormalities.

28. Mr. Reali's chest pain, elevated blood pressure and borderline EKG required emergency transport to the hospital for immediate evaluation and treatment.

29. Instead, Salazar contacted provider Roslyn Strohm who ordered a single dose of Clonidine and he was then returned to his cell.

30. The following morning on July 2nd, Mr. Reali was evaluated by Roslyn Strohm following additional complaints of chest pain.

4

31. Mr. Reali's blood pressure at this time was elevated, at 160/90 and EKG at 9:11am showed new significant down-sloping ST depression in lateral leads and horizontal ST depression in inferior leads. His QRS interval had also widened from normal to 134ms. Finding are consistent with high-risk unstable angina.

32. Mr. Reali again required emergency transport to a hospital for treatment.

33. Instead, Strohm assessed Mr. Reali as experiencing anxiety and ordered a single dose of Clonidine and returned him to his cell.

34. This is shocking that a person who is having on and off chest pain with clear EKG changes and a history of heart disease, would be treated with such gross indifference and not sent to the hospital for evaluation and treatment. An assessment of anxiety in the face of these diagnostic results was unwarranted and indefensible.

35. Early in the morning of July 3, 2017, Mr. Reali was taken to medical yet again for chest pain.

36. Medical staff noted Mr. Reali was grunting and clutching his chest while yelling, "it hurts what's happening to me." Soon, Mr. Reali told medical staff, "I can't breathe," then lost consciousness and became unresponsive.

37. Mr. Reali then exhibited seizure like activity and medical staff then instructed officers to call an ambulance. Shortly after, no pulse was noted and CPR was started. During code, one shock was advised and performed. Pulse was eventually obtained. Mr. Reali had a cardiac arrest due to his untreated cardiac condition.

38. Chest pains should always be taken seriously and evaluated immediately. Medical providers clearly should understand this.

39. Chest pain combined with new abnormal EKG changes are highly suggestive of an active cardiac process and requires immediate emergency medical care in a monitored setting as these patients are at risk of cardiac arrest and death. This is a basic knowledge among medical providers.

40. The fact that patient's symptoms were recurrent, is consistent with a clear unstable pattern.

41. Mr. Reali repeatedly reported complaints of chest pain over his time at DACDC. Medical staff also consistently recorded these symptoms over the course of his detention at DACDC.

42. Instead of treating Mr. Reali's severe symptoms, medical staff provided scant care, effectively ignoring his recurrent symptoms and EKG abnormalities.

43. Based on the medical records created, it is clear providers Roslyn Strohm, Veronica Salazar, and David Miller deliberately ignored Mr. Reali's serious symptoms and denied him appropriate medical care in the face of life-threatening medical emergency over the course of several weeks.

44. As a result of Veronica Salazar, David Miller, and Roslyn Strohm's indifference, Mr. Reali's condition worsened until he suffered a serious cardiac event resulting in cardiac arrest and a prolonged hospitalization.

FURTHER AFFIANT SAYETH NAUGHT.

I declare under penalty of perjury that the foregoing is true and correct. Executed on 3rd day of August 2020.

_____
Alon Steinberg, M.D., F.A.C.C.