IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

ANTONIO REALI,

      Plaintiff,

v.                                            No. 2:19-CV-00603 MV/SMV

BOARD OF COUNTY COMMISSIONERS
FOR THE COUNTY OF DOÑA ANA, CORIZON
HEALTH, INC., CHRISTOPHER BARELA,
VERONICA SALAZAR, DAVID MILLER,
ROSLYN STROHM, KEVIN SILVA, and
CHAD HILL

      Defendants.

## DECLARATION OF MADELEINE LAMARRE

    1.    I, Madeleine LaMarre, MN, FNP-BC, am over the age of eighteen and am competent to testify as to the matters set forth herein.

    2.    My testimony is based on my personal knowledge and regards matters to which I am competent to testify to.

    3.    I am a certified family nurse practitioner with a masters in nursing and 38 years of experience in correctional medicine.

    4.    The following is based on my review of Mr. Reali's medical records and my professional experience in the field.

    5.    Mr. Antonio Reali is a 56-year-old man who was arrested and booked into the Madera County Jail on May 20, 2017. On 5/28/17, Madera County health care staff completed a medical transfer summary, noting that Mr. Reali complained of chest pain and depression.

**EXHIBIT 2**

1

6. On May 31, 2017, Mr. Antonio Reali transferred from Madera County Jail to the Dona Ana County Detention Center (DACDC). The transfer summary from Madera County was provided to Corizon medical staff at DACDC when he arrived.

7. On May 31, 2017 at 0049 a Medical Intake Interview form was completed. The patient reported a history of seizures, neck injury, depression and PTSD. The form was reviewed by Steven Gomez, LPN.

8. Steven Gomez, LPN then performed a medical screening noting the patient had been incarcerated at DACDC in 2016. The patient reported a history of a heart attack and seizure disorder in the prior 1-6 months. The nurse did not explore this history. His vital signs were normal except a low-grade fever of 99.5°F.

9. On June 6, 2017, Roslyn Strohm, FNP saw the patient for chronic disease management. The NP noted the patient had seizure disorder and CAD (coronary artery disease). The nurse practitioner documented that the patient "has chest pains, drops to the ground, then goes away. Self-diagnosed; 'passes out from pain'" The nurse practitioner documented the patient's seizure disorder and CAD to be stable and planned to see the patient in 90 days.

10. Strohm diagnosed the patient with coronary artery disease but failed to take a history of the patient's CAD history or chest pain including first onset, location, quality, intensity, radiation, associated symptoms. She also did not address and explore the patient's recent history of chest pain noted on the Madera medical transfer summary or his reported history of myocardial infarction (heart attack) noted on the Medical Screening form. This falls below the standard of care for a nurse practitioner.

11. The following day, Roslyn Strohm, FNP ordered a baseline EKG, chest x-ray, and labs to include lipids, chemical profile, hemogram, TSH and U/A (urinalysis).

12. On June 9, 2017 at 20:27 a baseline EKG and showed normal sinus rhythm and a normal EKG. On 6/11/17 Roslyn Strohm FNP reviewed the EKG.

13. On June 10, 2017, the patient's urinalysis results returned abnormal, showing evidence of a urinary tract infection. Although Strohm reviewed this report, she never evaluated the patient for symptoms of a urinary tract or sexually transmitted infection. Undiagnosed urinary tract infections may lead to urosepsis, hospitalizations and death. She did not repeat the urinalysis and culture to determine if it was still abnormal. This falls below the standard of care for a nurse practitioner.

14. On June 17, 2017 at 20:20 Mr. Reali was brought to medical for chest pain. Veronica Salazar, RN assessed the patient. His blood pressure was 162/108 mm Hg. Salazar contacted Roslyn Strohm, FNP-BC via telephone who ordered a one-time dose of 0.1 clonidine and blood pressure checks.

15. Salazar did not take any history of the onset, quality, duration, or associated symptoms, nor note the patient's recent chest pain at Madera County Jail and report of a myocardial infarction (heart attack) in the past 6 months. The nurse did not perform an EKG or repeat the patient's blood pressure after administering the patient clonidine. There was no order for nurse practitioner follow-up of the patient's elevated blood pressure or chest pain. This falls below the standard of care for a registered nurse.

16. Two days later, on June 19, 2017, at 12:54 Andrea Mook, RN documented the patient was seen in medical after an officer called and reported the patient said he was having heart problems. He denied chest pain and shortness of breath but thought his blood pressure was high. Mr. Reali's blood pressure reading was 144/96 mm Hg. The RN advised the patient who stated

that his blood pressure was "not so bad, can I go?" The Andrea Mook, RN reviewed deep breathing exercises for anxiety then returned the patient to his housing unit.

17. This was Mr. Reali's second complaint of chest pain or "heart problems" and increased blood pressure, so the nurse should have referred the patient to the nurse practitioner but failed to do so.

18. On June 21, 2017 a registered nurse performed a history and physical examination. Mr. Reali reported a history of heart attack within 1-6 months. The nurse did not explore this history or ask about cardiovascular signs and symptoms such as chest pain, shortness of breath, palpitations. No treatment plan was documented, and the examination was signed off by a nurse practitioner, Eduardo Berumen.

19. Neither the registered nurse nor the nurse practitioner who cosigned the physical examination explored the patient's reported history of a heart attack in the past six months. This is significant because one would expect a patient with a history of a heart attack to be prescribed medications for cardiovascular disease, including aspirin, a statin drug, or nitroglycerin tablets to take when chest pain occurs. The failure of the nurse practitioner to address the findings on the history and physical falls below the standard of care.

20. On Saturday, July 1, 2017 at 09:46 Andrea Mook, RN saw the patient for complaint of chest pain 8 of 10 in severity. The patient came into the clinic and laid down on the floor in front of a bench. He reported that he experiences intermittent chest pain and when it occurs, he lies down, vomits, and it goes away. The patient gave a history of 3 previous myocardial infarctions. The nurse documented an elevated blood pressure reading of 174/130 mm Hg.

21. At 09:52 Mr. Reali's blood pressure remained elevated, at 170/110 mm Hg, and an EKG showed sinus rhythm, left atrial abnormality and extensive S-T changes suggestive of myocardial injury/ischemia. The nurse planned to contact a provider for chest pain, abnormal vital signs, and an abnormal EKG according to the protocol. The nurse documented that the provider was notified and although not specified in the note, the nurse practitioner ordered Clonidine 0.1 mg for one dose. The nurse administered the medication but did not repeat the patient's vital signs. At 10:56 an EKG was normal. At an unspecified time, the nurse documented that the patients' chest pain had resolved and Mr. Reali was returned to his housing unit.

22. The nurse's failure to repeat the patients' vital signs after two significantly abnormal blood pressure measurements falls below the standard of care for a registered nurse.

23. The nurse practitioner failed to instruct the nurse transport Mr. Reali to the hospital. Based upon the patient's history, clinical presentation, abnormal vital signs and abnormal EKG, there is no question this should have been done as these are signs and symptoms of acute coronary syndrome (ACS), which is a heart attack. This falls below the standard of care for a nurse practitioner and was deliberately indifferent to his serous medical needs.

24. On 7/1/17 at 22:41, a "Code Mary" was called in G2 pod. Staff respond to the unit and found the patient lying on the floor groaning and stating that no one should touch him. The patient was angry at the pod officer and stated, "I told him I needed to go to medical earlier. I could have made it." This suggests that officers delayed contacting health care staff when Mr. Reali complained of chest pain. He was eventually taken via wheelchair to the clinic. The patient felt like he needed to vomit but did not. The patient described his pain as dull, mid-sternum and was starting to subside.

25. Vitals were taken and an EKG was conducted. Mr. Reali's blood pressure was extremely elevated, at 188/110 mm Hg and the EKG was borderline, showing nonspecific lateral S-T changes. The nurse notified Roslyn Strohm, FNP-BC who ordered clonidine 0.1 mg now and lisinopril 20 mg daily and to follow-up with the nurse practitioner in the morning. At 23:10 a nurse administered clonidine 0.1 mg to the patient. The nurse instructed the patient to advise medical if the pain returns and sent the patient back to his housing unit.

26. This was the patient's second episode of chest pain, abnormal vital signs and abnormal/borderline EKG in the same evening. Although Mr. Reali was having signs and symptoms of acute coronary syndrome (ACS), the nurse practitioner failed to have Mr. Reali transported to the hospital via ambulance and was deliberately indifferent to his serious medical needs.

27. The nurse also did not repeat the patient's blood pressure following an extremely abnormal measurement of BP=188/110 mm Hg. This also falls below the standard of care for a registered nurse and was deliberately indifferent to his serious medical needs.

28. On July 2, 2017 Roslyn Strohm NP saw the patient who was screaming that he was in pain and not to touch him. Mr. Reali's blood pressure was elevated, at 160/90 mm Hg.

29. At 09:10 Roslyn Strohm, FNP reviewed the patient's first EKG's, documenting "Clinical non-acute presentation, no radiation, no diaphoresis, resolved chest pain few minutes. See follow-up EKG on chart." The nurse practitioner's rationale for documenting "clinical non-acute presentation" is inexplicable given the patient's chest pain, abnormal vital signs and abnormal EKG.

30. The same day at 09:11 an EKG was abnormal, showing sinus rhythm with PAC's, left axis deviation, IV conduction defect, left ventricular hypertrophy, and inferior/lateral changes,

6

S-T changes are probably due to ventricular hypertrophy. At 09:12 Roslyn Strohm, FNP signed the report. The NP wrote an order to keep Mr. Reali in medical for observation until repeat EKG is performed in 20 minutes.

31. A repeat EKG was performed at 10:30, which was abnormal, normal sinus rhythm and an inferior infarct, age undetermined. On July 2, 2017 at an undocumented time, Roslyn Strohm, FNP signed the report.

32. On 6/7/17, Strohm diagnosed Mr. Reali with coronary artery disease (CAD). However, despite several episodes of chest pain and hypertension in the past month, including 3 episodes in the previous 24 hours, with severely abnormal blood pressure and abnormal EKG's, she diagnosed the patient with anxiety.

33. The nurse practitioner's failure to send the patient to the hospital for evaluation at the time of his chest pain, abnormal vital signs and abnormal EKG falls below the standard of care for a nurse practitioner and was deliberately indifferent to his serious medical needs.

34. On July 3, 2017 at 03:38 officers called a "Code Mary" in G pod. When medical staff responded, officers reported that he was walking to medical. Staff met the patient at the entry of medical and he was placed in a wheelchair. He was clutching his chest and stated, "It hurts, what's happening to me?" The patient was able to transfer from the wheelchair onto the exam table.

35. At 03:40 the patient was conscious but in distress, stating "I can't breathe". An LPN was unable to obtain a blood pressure because of patient movement.

36. At 03:42 the patient sat up and stated, "I can't breathe" then lost consciousness and staff assisted him to lay back down on the exam table. He did not respond to sternal rub. His pulse was 123 bpm, had no respirations, and his oxygen saturation was decrease at 89%. Mr. Reali then

7

suffered seizure-like activity then lost bowel and bladder control. At this time emergency medical services should have been called.

37. At 03:44 officers were instructed to call an ambulance, which was not called until 03:48, ten minutes after Mr. Reali arrived in the medical unit in distress. This delay by Salazar in calling emergency medical services was unacceptable.

38. At 03:55 no pulse was noted, and staff began CPR. One minute later, Emergency Medical Technicians (EMT) arrived on site and took over CPR.

39. At 04:10 a pulse was obtained, and Mr. Reali began breathing independently. EMTs departed with patient at 04:20 for Memorial Medical Center where he was admitted to the cardiac care unit.

40. Jail medical staff are equipped to provide primary care, and minimal secondary care, to inmates at their facilities. Medical staff practicing in jails, like the defendants in this case, are not capable of providing tertiary, or hospital level, care.

41. Importantly, medical staff in jails and prisons, like the defendants in this case, do not have the capacity to diagnose and treat heart attacks. Any person exhibiting symptoms of a possible heart attack must always be sent to the hospital.

42. Corizon's medical protocols required lower level staff to contact a nurse practitioner if any inmate exhibited chest pain for further evaluation. Nurse practitioners are educated and trained on how to identify symptoms of a possible heart attack, and have an obligation to refer patients with a potential heart attack to the hospital.

43. Despite exhibiting clear symptoms of a heart attack, Roslyn Strohm, a nurse practitioner, failed to refer Mr. Reali to a hospital via ambulance on several occasions.

44. Defendants Salazar, and Strohm's failures to immediately obtain emergency medical care or immediate transport to a hospital setting when Mr. Reali presented with chest pain, elevated blood pressure, and an abnormal EKG on July 1, 2017 was deliberately indifferent to his serious medical condition.

45. The defendants' failure to send Mr. Reali to the hospital at each subsequent encounter with this combination of symptoms and diagnostic results was unacceptable and indifferent to his serious medical needs.

FURTHER AFFIANT SAYETH NAUGHT.

I declare under penalty of perjury that the foregoing is true and correct. Executed on the 7th day of August 2020.

_____
Madeleine LaMarre, MN, FNP-BC