## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

ANTONIO REALI,

      Plaintiff,

vs.                                                              No. 2:19-CV-00603 MV/JHR

BOARD OF COUNTY COMMISSIONERS
FOR THE COUNTY OF DOÑA ANA, CORIZON
HEALTH, INC., CHRISTOPHER BARELA,
VERONICA SALAZAR, DAVID MILLER,
ROSLYN STROHM, KEVIN SILVA,
and CHAD HILL
          Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

THIS MATTER is before the Court on the Motion for Summary Judgment on the Basis of

Qualified Immunity filed by Defendants Board of County Commissioners ("Board"), Christopher

Barela, Kevin Silva, and Chad Hill. Doc. 51. Having considered the briefs and relevant law, and

being otherwise fully informed, the Court finds that the Motion will be denied in part and granted

in part, consistent with this Memorandum Opinion and Order.

## BACKGROUND

"The facts supported by evidence, [viewed] in the light most favorable to [Plaintiff]" as the

party opposing summary judgment are as follows. *Cavanaugh v. Woods Cross City,* 625 F.3d 661,

662 (10th Cir. 2010). Plaintiff was incarcerated at the Doña Ana County Detention Center

("DACDC") from May 31, 2017, through July 5, 2017. Doc. 51-2. At this time, Defendant

Christopher Barela was the warden of the detention center. Furthermore, prior to Plaintiff's

incarceration at DACDC, on March 30, 2016, Defendant Board executed a contract for services

with Corizon Health, Inc. to provide medical services for detainees at DACDC. Doc. 51-1. Section

3.0 on the Scope of Services section of the contract provides that Corizon Health is to "provide

comprehensive medical, dental, mental health, and ancillary health care services for" all detainees. *Id.* at 3. However, as part of a 240-hour training course, DACDC officers are instructed to call for emergency medical assistance from Corizon medical staff when a detainee reports or shows signs of medical distress. Doc. 51-7 at ¶¶ 18, 19; Doc. 51-8 at ¶ 7; Doc. 51-12 at ¶¶ 19, 20.

Plaintiff had a history of chest pain and related heart problems when he first arrived at DACDC. Doc. 64-3 ¶ 3. Upon intake, Plaintiff advised staff[1] that it was crucial for him to take nitroglycerin when he began experiencing chest pain and that, without this medication, he could experience a fatal heart attack. Doc. 64-3, ¶¶ 4-6. While he was at DACDC, Plaintiff resided in the Gulf pod. Doc. 64-6 at 1. In each pod at DACDC, a staff member is stationed in a central control room, commonly referred to as "the bubble." Doc. 51-3.

Plaintiff began experiencing chest pain within a week of being booked into DACDC. Doc. 64-3 ¶ 8. Each time Plaintiff went to the medical unit, the guard in the bubble allowed him to leave the pod to walk to medical through the corridor. Doc. 64-3 ¶ 13. Plaintiff often saw Defendant Silva working in the bubble during his time at DACDC, including on several days when he went to medical for his chest pains. Doc. 51-3 at 3. Plaintiff went to medical for complaints of chest pain at least twice in June of 2017. Doc. 64-6 at 4.

On July 1, 2017, while Defendant Hill was on duty in the Gulf pod bubble, Plaintiff reported chest pains to Defendant Hill from the Gulf 2 dayroom and repeatedly yelled, asking to be taken to medical. Doc. 64-3 ¶ 14. Defendant Hill saw and heard Plaintiff requesting to go to medical, but ignored him for 20 minutes until Plaintiff collapsed to the floor outside of the bubble where Defendant Hill was stationed. *Id.* at 22:41, Defendant Hill called a Code Mary, which is

---

[1] It is unclear from the record whether this information was relayed to medical staff employed by Corizon Health or to detention center staff.

used for a true medical emergency involving a life-or-death situation that demands immediate response from the Medical Division to the location of the detainee. Doc. 51–3, Attachment 2. Corizon staff and Sergeant Alfonso Cortez responded to the emergency. *Id.* When medical personnel arrived at the pod, Plaintiff was in so much pain that he could not walk or stand. Doc. 64-3 ¶¶ 18–19. At first, Plaintiff told Sergeant Cortez and Corizon staff, "Don't touch me! If the guy in the bubble would of [sic] sent me to medical, I would not be hurting right now!" Doc. 51–3 at 5. Sergeant Cortez advised Plaintiff to allow medical staff to check his vitals, but Plaintiff stated, "No! Don't touch me I'm in too much pain!" *Id.* After Sergeant Cortez again asked him to allow medical staff to do their job, Plaintiff got up and sat in a wheelchair provided for him. *Id.* Once he was at the medical unit, Plaintiff was seen by Nurse Veronica Salazar. *Id.* He stated that he needed to vomit, but did not do so. Doc. 51–5. Nurse Salazar performed an EKG, which showed "nonspecific lateral ST changes," an abnormal result. *Id.* Plaintiff then reported that his pain had subsided at this point. *Id.* He further stated, "I think it's my lungs" and noted that he had previously had a chest x-ray at the VA hospital. *Id.* His blood pressure was at 188/110 and he was prescribed 0.1 mg of Clonidine to take that night as well as Lisinopril to take in the morning and was sent back to his pod. *Id.* Afterwards, Defendant Hill saw Plaintiff in his bed at around 1:00 in the morning. Doc. 51-12 ¶ 16.

In the early morning hours of July 3, 2017, Plaintiff got up to go to the bathroom and began feeling pain in his chest again. Doc. 64-3 ¶ 21. He informed the guard on duty in the bubble, Defendant Silva, that he was having chest pain. *Id.* ¶ 22. Defendant Silva told Plaintiff to go back to his cell and did not call medical. *Id.* ¶ 25. Plaintiff knocked on the window of the bubble several times and yelled that his pain was worsening. *Id.* ¶ 27. Defendant Silva told Plaintiff to sit and wait for medical to arrive. *Id.* ¶ 29. Other detainees in the pod came out to watch, and Plaintiff's

cellmate also approached the bubble to inform Defendant Silva that Plaintiff needed to go to medical. *Id.* ¶ 32. Defendant Silva ignored the repeated requests and Plaintiff waited for 45 minutes to receive medical attention. *Id.* ¶ 33. Defendant Silva called a Code Mary at 3:38 a.m., after another detainee, Joshua Rocha, waived him down and told him that Plaintiff was having "an attack." Doc. 51-6 ¶ 16. Doc. 64–6 at 1. When medical staff went to respond to the code, they were informed that Plaintiff was walking to medical. Doc. 64-6 at 1. Plaintiff arrived at the medical unit grunting and clutching his chest, stating, "It hurts, what's happening to me?" *Id.* At 3:40 a.m., medical staff attempted to take Plaintiff's blood pressure, but were unable to do so, because he was moving, grunting, and yelling. *Id.* He was hyperventilating and in distress, stating, "I can't breathe." *Id.* At 3:42 a.m., Plaintiff lost consciousness, stiffened, and exhibited seizure-like activity for 30 seconds. *Id.* Sergeant Cortez reported that when this occurred, Plaintiff stopped breathing, began foaming at the mouth, and leaned over. Doc. 51-4 ¶ 19. Medical staff administered oxygen via a bag valve mask and Plaintiff lost bladder and bowel control. Doc. 64-6 at 1. At 3:44 a.m., Nurse Salazar instructed Officer Tiara Gamboa to call an ambulance. Doc. 51-7 ¶ 12; Doc. 64-6 at 1. Officer Gamboa went to master control and instructed staff to call 911. *Id.* An emergency call was placed at approximately 3:48 a.m. Doc. 64-6 at 2. Meanwhile, at 3:46 a.m., medical staff called CNP Strohm and advised her of Plaintiff's condition. *Id.* at 1. She ordered staff to administer 4 mg of Ativan and to have him transported to the emergency room via ambulance. *Id.* Staff administered 4 mg of Ativan at 3:51 a.m., and after injections, there was no radial pulse located and Plaintiff's carotid pulse was thready. *Id.* Staff continued to administer oxygen via a bag valve mask. *Id.* At 3:55 a.m., no pulse was detected and LPN David Miller started CPR on Plaintiff. *Id.* Emergency personnel arrived at the scene at 3:54 a.m. and took over CPR at 3:56 a.m. *Id.* at 1-2. EMT staff administered two rounds of epinephrine and one round of Narcan. *Id.* They then administered a

shock with a defibrillator and continued administering CPR, until a pulse was obtained at 4:10 a.m. and Plaintiff was breathing independently. *Id.* Noting the seriousness of the incident, at approximately 3:58 a.m., Sergeant Cortez began filming the scene with a handheld camera. Doc. 64-7 at 1.

In his Amended Complaint, Plaintiff alleges that Defendants Hill and Silva violated his constitutional rights by delaying his access to medical care. *See* Doc. 59, Count I. He also alleges that Defendants Board and Christopher Barela maintained a custom and policy of violating the constitutional rights of pretrial detainees at DACDC. *Id.,* Count IV. He further brings a claim under New Mexico state law alleging that Defendants Board and Barela engaged in the negligent maintenance of a medical facility. *Id.,* Count III. Defendants Hill, Silva, Barela, and Board filed a Motion for Summary Judgment. Doc. 51.

## DISCUSSION

I.    <u>Plaintiff's Due Process Claim Against Defendants Hill and Silva</u>

In Count I of the Amended Complaint, Plaintiff alleges that Defendants Hill and Silva violated his clearly established due process right as a detainee to receive medical care that they knew or should have known he required. Doc. 59 at ¶¶ 176-186. Defendants argue that, even under Plaintiff's version of the facts, they did not violate any clearly established Fourteenth Amendment due process right and are therefore entitled to qualified immunity and summary judgment on this claim. Doc. 51 at 10. Ultimately, the Court finds that Defendants Hill and Silva are not entitled to qualified immunity, and that the summary judgment motion with respect to these Defendants must be denied.

A.  Legal Standard

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the initial burden of establishing that there is an absence of evidence to support the non-movant's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the movant meets this burden, the non-movant must come forward with specific facts, supported by admissible evidence, that demonstrate the existence of a genuine dispute. *Comm. for First Amendment v. Campbell*, 962 F.2d 1517, 1526 n. 11 (10th Cir. 1992). The court "construe[s] the factual record and the reasonable inferences therefrom in the light most favorable to the nonmoving party." *Mata v. Saiz*, 427 F.3d 745, 749 (10th Cir. 2005).

In the instant case, Defendants move for summary judgment on the basis of qualified immunity. Therefore, before the Court determines whether there is a genuine dispute as to any material fact that would make summary judgment inappropriate, the Court must first determine whether Plaintiff's factual allegations, supported by the record, are sufficient such that a reasonable jury would find that "the defendant violated his constitutional or statutory rights, and that the right was clearly established at the time of the alleged unlawful activity." *Riggins v. Goodman,* 572 F.3d 1101, 1107 (10th Cir. 2009); *see also Cox v. Glanz,* 800 F.3d 1231, 1242 (10th Cir. 2015) (quoting *Thomas v. Salt Lake Cty.,* 584 F.3d 1304, 1326 (10th Cir. 2009) (Holmes, J., concurring)) (where a defendant raises qualified immunity at the summary judgement stage, "the objective is *not* to determine whether a plaintiff survives summary judgment because plaintiff's evidence raises material issues that warrant resolution by a jury" but to determine whether plaintiff's facts support a denial of qualified immunity). If the plaintiff successfully establishes the violation of a clearly established right, based upon his or allegations grounded sufficiently in the record, then the burden

returns to the defendant to prove that he is entitled nonetheless to judgment as a matter of law. *Green v. Padilla,* 697 F. Supp. 3d 1115, 1177 (D.N.M. 2023) (citing *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001)).

Qualified immunity protects government officials performing discretionary functions "when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Brown v. Montoya*, 662 F.3d 1152, 1164 (10th Cir. 2011). In keeping with the purposes of qualified immunity, "special rules apply when an official raises a defense of qualified immunity on summary judgment." *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 779 (10th Cir. 1993). Specifically, "qualified immunity requires a two-step sequence." *Morris v. Noe*, 672 F.3d 1185, 1191 (10th Cir. 2012) (citation omitted). "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Id.* (citation omitted). "If the plaintiff fails to satisfy either part of the two-part inquiry, the court must grant the defendant qualified immunity." *Gross v. Pirtle*, 245 F.3d 1151, 1156 (10th Cir. 2001). The court has "the freedom to decide 'which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.'" *Lundstrom v. Romero*, 616 F.3d 1108, 1118 (10th Cir. 2010) (quoting *Pearson v. Callahan*, 555 U.S. 223 (2009)).

B. <u>Viewing the Evidence in the Light Most Favorable to Plaintiff, Defendants Hill and Silva Violated Plaintiff's 14th Amendment Right to Medical Care.</u>

Under the first prong of the qualified immunity analysis, the Court determines whether, viewing the evidence in the light most favorable to Plaintiff, the facts show that Defendants denied or delayed Plaintiff access to medical care in violation of his Fourteenth Amendment rights. *See Mata*, 427 F.3d at 749-50. "Under the Fourteenth Amendment's Due Process Clause, pretrial

detainees are entitled to the same degree of protection against denial of medical care as that afforded to convicted inmates under the Eighth Amendment." *Barrie v. Grand County, Utah,* 119 F.3d 862, 868 (10th Cir. 1997); *see also Blackmon v. Sutton*, 734 F.3d 1237, 1244 (10th Cir. 2013) ("[D]etention officials surely owe pretrial detainees . . . at least the same standard of care prison officials owe convicted inmates."). Accordingly, Plaintiff's due process claim must be assessed under the "deliberate indifference" standard developed in the Eighth Amendment context. *Blackmon*, 734 F.3d at 1244; *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1315 (10th Cir. 2002) ("Although pretrial detainees are protected under the Due Process Clause rather than the Eighth Amendment, this Court applies an analysis identical to that applied in Eighth Amendment cases brought pursuant to § 1983.").

Specifically, in *Estelle v. Gamble*, the Supreme Court held that "[a] prison official's deliberate indifference to an inmate's serious medical needs is a violation of the Eighth Amendment's prohibition against cruel and unusual punishment." *Mata*, 427 F.3d at 751 (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) ("[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment.")). Such deliberate indifference may be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle*, 429 U.S. at 104-05.

Under the *Estelle* deliberate indifference standard, the test for constitutional liability of prison officials "involves both an objective and a subjective component." *Mata*, 427 F.3d at 751 (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)). First, Plaintiff must show "objective evidence that the deprivation at issue was in fact 'sufficiently serious.'" *Id.* "A medical

need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Sealock*, 218 F.3d at 1209 (citation omitted). If a plaintiff's claim is based on a delay in medical care, the plaintiff also must show that "the delay resulted in substantial harm." *Mata*, 427 F.3d at 751 (citation omitted). "The substantial harm requirement may be satisfied by lifelong handicap, permanent loss, or considerable pain." *Id.* (citation omitted).

In *Mata*, the Tenth Circuit clarified that, in determining whether the plaintiff has suffered substantial harm as a result of a delay in medical care, there are two distinct types of "substantial harm" that the Court may consider. 427 F.3d at 753. First, the Court may consider "some intermediate harm," such as the plaintiff's experience of prolonged or severe pain or suffering during the period when medical attention was withheld or delayed. *Id.*; *see also Kikumura v. Osagie*, 461 F.3d 1269, 1292 (10th Cir. 2006) ("The 'substantial harm' can . . . be an intermediate injury, such as the pain experienced while waiting for treatment and analgesics."), overruled on other grounds by *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), as explained in *Robbins v. Oklahoma*, 519 F.3d 1242, 1246–47 (10th Cir. 2008); *Beers v. Ballard*, 248 F. Appx. 988, 991 (10th Cir. 2007) ("Mr. Barnes may have suffered from greater or more prolonged pain, a cognizable substantial harm," as a result of "the delay in attending to Mr. Barnes after his collapse.") (citing *Sealock*, 218 F.3d at 1210 n. 5 ("[T]here is factual evidence from which a jury could conclude that the delay occasioned by . . . inaction unnecessarily prolonged appellant's pain and suffering."); *Oxendine v. Kaplan*, 241 F.3d 1272, 1278 (10th Cir. 2001) ("[T]he delay . . . caused substantial harm due to the fact that . . . Oxendine experienced considerable pain.")). Second, the Court may consider "the last untoward event to befall" the plaintiff, such as the subsequent or long-term deleterious effect on the plaintiff's health caused by the prison's dilatory response to his medical

needs. *Mata*, 427 F.3d at 753; *see also Kikumura*, 461 F.3d at 1292 (The "'substantial harm' can

be the ultimate physical injury caused by the prisoner's illness, so long as the prisoner can show

that the more timely receipt of medical treatment would have minimized or prevented the harm.");

*Beers*, 248 F. App'x at 991 ("[T]he time-frame for administering life-saving treatment could have

passed during the period of delay; if such treatment had a realistic chance of success, the prison's

dilatory response could be said to have proximately caused his death.") (citing *Lewis v.

Wallenstein*, 769 F.2d 1173, 1183 (7th Cir. 1985) ("[C]ausal connection existed between" doctor's

15-minute delay in attending to inmate and inmate's death from cardiac arrest.)). Regardless of

which type of harm the detainee seeks to establish, "the focus of the objective prong should be

solely on whether the harm is sufficiently serious." *Id.*

     For example, in *Sealock*, the plaintiff presented to prison staff with severe chest pain and

ultimately suffered a heart attack. The court first considered a possible claim that the heart attack

itself was a sufficiently serious harm to establish the objective component of the deliberate

indifference test, but rejected the claim because the plaintiff did not present specific medical

evidence of a subsequent harm, namely, "damage to his heart resulting from the delay." 218 F.3d

at 1210. Nonetheless, the court found that the plaintiff had shown that his need was sufficiently

serious to require prompt medical attention, based alone on the interim harm, namely, the

symptoms that he presented to the prison staff:

> Appellant presented evidence that he suffered from severe chest pain which he
> reasonabl[y] believed was caused by a heart attack. The pain and suffering imposed
> by Barrett's failure to get him treatment lasted several hours. The Eighth
> Amendment forbids unnecessary and wanton infliction of pain. Certainly, not every
> twinge of pain suffered as a result of delay in medical care is actionable. The
> evidence in this case, however, sufficiently establishes the objective element of the
> deliberate indifference test.

*Id.* (citations omitted).

In *Mata*, the plaintiff similarly presented to prison staff with severe chest pain and ultimately suffered a heart attack. The court determined that "both Ms. Mata's severe chest pain and her heart attack each [were] sufficiently serious to satisfy the objective prong." 427 F.3d at 753. Specifically, the court found that the plaintiff's evidence "that she did in fact suffer severe pain for several days" went "way beyond a twinge" and thus was alone sufficient to establish the objective element of the deliberate indifference test. *Id.* at 755. Further, the court found that evidence that the plaintiff suffered a heart attack was also independently sufficient to establish the objective element of the deliberate indifference test. *Id.* Thus, the court concluded that the plaintiff had "exceeded the minimum evidentiary requirement . . . by presenting specific evidence that she suffered both unnecessary pain and a worsening in her condition – in the form of permanent and irreversible heart damage." *Id.*

Once a plaintiff has met the objective prong of the deliberate indifference test by demonstrating that his or her "medical need was objectively sufficiently serious and that defendants' delay in meeting that need caused [him] or her substantial harm," the plaintiff next must meet the subjective prong of the deliberate indifference test. *Id.* at 752. "[T]o meet the subjective prong of the deliberate indifference test, [the plaintiff is required] to provide evidence supporting an inference that defendants knew about and disregarded a substantial risk of harm to her health and safety." *Id.* The deliberate indifference standard applies "not only to medical professionals who fail to treat, but also prison officials who assume 'gate keeping' authority over prisoner access to medical professionals." *Blackmon*, 734 F.3d at 1245. Notably, "[e]ven a brief delay [in an officer's performance of his gatekeeping authority] may be unconstitutional." *Mata*, 427 F.3d at 755. Furthermore, "the official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."

*Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Accordingly, "one way a prisoner may satisfy the subjective component of the deliberate indifference test is to show that a 'gate keeping' prison official den[ied] or delay[ed] him access to medical care in conscious disregard of a substantial risk of serious harm." *Id.* (citation omitted).

Plaintiff's claim stems from Defendant Hill's 20-minute delay and Defendant Silva's 45-minute delay in calling for medical help when Plaintiff complained of chest pains. To establish a constitutional violation, Plaintiff must meet both the objective component, by showing that his medical need was sufficiently serious and that he suffered substantial harm from the delay, and the subjective component, by showing that Defendants Hill and Silva knew of the significant risk to Plaintiff's health and disregarded it.

### Objective Component

The record before the Court does not establish that, by waiting to call for medical help for Plaintiff, either Defendant Hill or Defendant Silva caused lasting damage to Plaintiff's heart or his overall health. Nevertheless, the evidence establishes that Plaintiff suffered a substantial "intermediate harm" as a result of these Defendants' delay in providing him access to medical care. *See Mata,* 427 F.3d at 753 (noting that the severe chest pain that the plaintiff endured while waiting for medical care was sufficient to establish a substantial harm). On July 2, 2017, Defendant Hill waited for 20 minutes after Plaintiff complained of severe chest pain to call a Code Mary, and did so only after Plaintiff collapsed from the pain. When medical arrived, Plaintiff was in such pain that he screamed, "No! Don't touch me I'm in too much pain!" and when he arrived at the medical unit, he lay down on the floor and started kicking and screaming. Similarly, on July 3, 2017, Defendant Silva waited for 45 minutes while Plaintiff repeatedly asked to be sent to medical, ultimately calling a Code Mary only after another inmate informed him Defendant Silva that

Plaintiff was seriously ill. During this period when access to medical attention was withheld or delayed, Plaintiff experienced severe pain. Indeed, reports note that he was grunting, yelling, and moving around until he suddenly lost consciousness, stiffened, and exhibited seizure-like activity for 30 seconds. Thus, the evidence demonstrates that Plaintiff experienced prolonged or severe pain during the 20-minute and 45-minute periods during which access to medical attention was withheld or delayed. During those periods of delay, Plaintiff's pain went "way beyond a twinge," and is sufficient to establish the objective element of the deliberate indifference test. *Mata,* 427 F.3d at 755.

Admittedly, the periods of delay Plaintiff experienced here are not as long as those in other cases, such as *Mata* and *Kikumura,* where plaintiffs endured severe pain for several hours or even days. However, the Tenth Circuit has made clear that "even a brief delay may be unconstitutional." *Mata,* 427 F.3d at 756. Indeed, any meaningful delay in treatment for symptoms requiring immediate attention, such as severe chest pain indicative of a heart attack, could result in permanent damage or death. *See Ducally v. Rhode Island Dep't of Corrs.,* 160 F. Supp. 2d 220, 224 (D.R.I. 2001) (plaintiff stated a cognizable claim under the deliberate indifference standard where a corrections officer did not call medical for one hour after plaintiff suffered severe cuts on his fingers); *Estate of Kowalski v. Shrader,* No. 21-CV-827, 2022 WL 19422, at *11 (D. Colo. Jan. 3, 2022) (plaintiff stated a cognizable claim where detention center staff ignored plaintiff's emergency calls for help for at least 15 to 20 minutes and the plaintiff was experiencing acute opioid withdrawal symptoms). Thus, Defendants' argument that they did not violate Plaintiff's right to medical care because the delays in this case were relatively short in comparison to other Tenth Circuit cases is unavailing.

Additionally, the evidence establishes that Plaintiff's medical need was "so obvious that even a lay person would easily recognize the necessity for a doctor's attention," thus making his medical need "sufficiently serious." *Sealock,* 218 F.3d at 1209. Plaintiff reported severe chest pains on July 2, 2017 and again on July 3, 2017, with medical records noting that at various points he was screaming, grunting, and lying on the ground. The Tenth Circuit has made clear that "severe chest pain, a symptom consistent with a heart attack, is a serious medical condition under the objective prong of the Eight Amendment's deliberate indifference standard." *Mata,* 427 F.3d at 754. Indeed, Defendants concede that Plaintiff's "injuries were nearly lethal." Doc. 51 at 14. Because the evidence demonstrates that Defendants delayed in meeting a sufficiently serious medical need, and that these delays caused Plaintiff to suffer substantial harm, "there are genuine factual issues precluding summary judgment against [Plaintiff] on the objective component of the *Estelle* test." *Mata,* 427 F.3d at 755.

### Subjective Component

In order to meet the subjective component of the deliberate indifference test, Plaintiff "must establish that Defendants knew he faced a substantial risk of harm and disregarded that risk, 'by failing to take reasonable measures to abate it.'" *Kikumura,* 461 F.3d at 1293 (quoting *Farmer,* 511 U.S. at 847). Because Defendants are not medical professionals, but instead jail officials who assumed "gate keeping" authority over Plaintiff's access to medical professionals, Plaintiff's specific burden is to demonstrate that Defendants "denied or delayed him access to medical care in conscious disregard of a substantial risk of serious harm." *Blackmon,* 734 F.3d at 1245. Defendants argue that, even assuming Plaintiff's version of the facts, Defendants did not act in conscious disregard of a substantial risk of serious harm because Plaintiff did not exhibit "undeniably serious sign[s] of medical distress," Plaintiff had walked independently to the medical

14

unit several times, and Defendants "could have plausibly questioned the authenticity of Plaintiff's chest pains." Doc. 76 at 12–13. These arguments are unavailing.

First, Defendants argue that they did not act in conscious disregard of a substantial risk of serious harm because, unlike the plaintiff in *Kikumura,* Plaintiff was not unconscious or bleeding but instead notified the officers that he was experiencing chest pain. This argument ignores the fact that Plaintiff was not calmly relaying to the officers that he was in pain. On July 2, 2017, for 20 minutes, Plaintiff yelled in distress that he was experiencing severe chest pain; he continued to express that he was in pain until Defendant Hill finally called a Code Mary. Doc. 64-3 at ¶ 17. On July 3, 2017, he again yelled and knocked on the window of the master control room where Defendant Silva was stationed. *Id.* at ¶ 38. The level of pain exhibited by this behavior would certainly count as an "undeniably serious sign of medical distress," even if it does not exactly match the symptoms exhibited by the plaintiff in *Kikumura.* Indeed, the Court in *Sealock* reversed a district court's decision to grant summary judgment where there was "evidence that [the gatekeeping officer] was informed that appellant might be having a heart attack, and that he was present when appellant displayed symptoms consistent with a heart attack." 218 F.3d at 1210; *see also Adams v. Franklin,* 111 F. Supp. 2d 1255, 1270 (M.D. Ala. 2000) (where plaintiff voiced complaints about chest pain and shortness of breath, the seriousness of the medical condition should have been obvious to officers who delayed access to medical care for two hours).

Defendants also argue that they were not deliberately indifferent to Plaintiff's medical needs because Plaintiff had walked independently to the medical unit several times prior and had returned with no obvious symptoms. This argument is also unconvincing. While the fact the Plaintiff frequently went to medical for chest pains might signal that his condition was not that serious, it is equally possible that his frequent trips to medical demonstrated that he had an ongoing,

serious medical condition that needed frequent monitoring and management by health care professionals. Thus, the fact that Plaintiff had successfully and independently gone to medical for chest pains several times before is weighed neutrally, as it could similarly signal either a benign or an extremely serious and ongoing condition.

Similarly, Defendants unconvincingly argue that they did not act in conscious disregard of a substantial risk to Plaintiff's health because, on July 2, 2017 and July 3, 2017, he walked independently to medical once a Code Mary was called. The fact that Plaintiff walked to medical after Defendants called a Code Mary, however, is irrelevant. The delay in calling the Code Mary is the violation. Therefore, it is what Defendants observed *before* they called the Code, not *after* they did so, that informs whether they were deliberately indifferent to Plaintiff's medical needs.

Lastly, Defendants argue that, given Plaintiff's many trips to medical, they could have plausibly believed that he was faking his symptoms. Defendants admit, however, that jail policy would have required them to call for medical assistance even if they believed Plaintiff was malingering. While a violation of jail policy does not amount to a constitutional violation, the Tenth Circuit has held that failure to comply with policy "certainly provide[s] circumstantial evidence that a . . . gatekeeper knew of a substantial risk of serious harm." *Paugh v. Uintah County,* 47 F.4th 1139, 1162 (10th Cir. 2022) (quoting *Prince v. Sherriff of Carter Cnty.,* 28 F.4th 1033, 1046 (10th Cir. 2022)). Thus, the fact that Defendants may have believed Plaintiff was faking his symptoms and chose, in violation of jail policy, not to call for medical assistance militates in favor of finding that they knew of a substantial risk of serious harm to Plaintiff and ignored it.

In sum, Defendant's arguments ignore the seriousness of Plaintiff's pleas for help and his extremely vocal manifestation of severe chest pain. Contrary to their contentions, the Court finds that Plaintiff's factual allegations, supported by the record, are sufficient such that a reasonable

jury would find that Defendants' refusal to perform their gatekeeping role demonstrated deliberate indifference to Plaintiff's serious medical needs in violation of his constitutional rights. *See Riggins,* 572 F.3d at 1107.

C.  Plaintiff's Constitutional Right was Clearly Established.

Having found that Defendants violated Plaintiff's constitutional right to medical care, the Court must determine whether the right was clearly established at the time of the violation. "A constitutional right is clearly established when, at the time of the alleged violation, the contours of the right were sufficiently clear that a reasonable official would understand that his actions violate that right." *Lundstrom*, 616 F.3d at 1118-19 (citation omitted). "This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Fisher v. City of Las Cruces*, 584 F.3d 888, 900 (10th Cir. 2009) (citation omitted). Accordingly, a "plaintiff must do more than identify in the abstract a clearly established right and allege that the defendant has violated it." *Lundstrom*, 616 F.3d at 1119. Specifically, a "plaintiff must show legal authority making it apparent that in light of pre-existing law a reasonable official would have known that the conduct in question violated the constitutional right at issue." *Id.*

This does not mean that the plaintiff must "present a case with an identical factual situation." *Id.* To the contrary, the Supreme Court has made clear that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful."); *see also Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007) ("The *Hope* decision shifted the qualified immunity analysis from a scavenger hunt for prior cases with precisely the same facts toward the more

relevant inquiry of whether the law put officials on fair notice that the described conduct was unconstitutional."). The "salient question" thus is whether the state of the law at the time of the alleged misconduct gave the defendant "fair warning" that their alleged misconduct was unconstitutional. *Hope*, 536 U.S. at 741. In order to answer this question, the court looks to "Supreme Court or Tenth Circuit precedent on point or clearly established weight of authority from other courts finding the law to be as the plaintiff maintains." *Lundstrom*, 616 F.3d at 1119.

A review of the relevant Tenth Circuit case law leaves no question that the constitutional right asserted here was clearly established by July 2017. First, in *Olsen,* the Tenth Circuit held that "[t]he right to custodial medical care is clearly established." 312 F.3d at 1315. Thereafter, in *Mata,* the Tenth Circuit reiterated that "deliberate indifference to an inmate's serious medical need is a clearly established constitutional right." 427 F.3d at 749. In *Kikumura,* the Tenth Circuit further clarified that the "deliberate indifference" standard for claims of inadequate medical care under the Eighth Amendment has "been clearly established at least since *Estelle v. Gamble,* 429 U.S. 97 at 104, decided in 1976." 461 F.3d at 1296. Later, in *Blackmon,* the Tenth Circuit clarified that "[b]y 1997 this court had clearly held that the Eighth Amendment is offended not only be medical professionals who fail to treat, but also by prison officials who assume 'gate keeping' authority over prisoner access to medical professionals." 734 F.3d at 1245 (citing *Ramos,* 639 F.3d at 575).

Beyond the clear establishment of a constitutional right to medical care, the Tenth Circuit precedent in *Sealock* fairly put Defendants on notice that even a brief delay of access to medical care for a detainee experiencing severe chest pain would constitute a violation of the detainee's constitutional right to medical treatment. *Hope*, 536 U.S. at 741. In *Sealock,* the plaintiff "presented evidence that he suffered from severe chest pain which he reasonably believed was caused by a heart attack." 218 F.3d at 1210. The plaintiff relayed this information to the correctional officer

18

who was in command of the shift that day. The officer told the plaintiff that there was nothing he could do for him and that it would take an hour to get the transport van warmed up, and offered him an antacid. *Id.* at 1208. As a result of the delay imposed by the officer's inaction, the plaintiff experienced pain and suffering for several hours. *Id.* at 1210. Admittedly, the delay in *Sealock* lasted for hours, whereas here the two delays lasted 20 minutes and 45 minutes, respectively. However, as noted above, the Tenth Circuit has twice held that when a detainee presents symptoms of a heart attack, such as severe chest pain, "even a brief delay may be unconstitutional." *Mata,* 427 F.3d at 755; *Kikumura,* 461 F.3d at 1297. Plaintiff repeatedly informed both Defendants that he was experiencing extreme chest pain, going so far as to bang on the window of the control room and yell in distress. The Court is thus presented with the exact situation contemplated by the Supreme Court in *Hope,* where a general constitutional rule mandating officers to treat severe chest pain seriously applies with "obvious clarity to the specific conduct in question." *Hope,* 536 U.S. at 741.

Furthermore, in *Sealock,* the Tenth Circuit found that the subjective component of the deliberate indifference test was satisfied by the evidence that the defendant "was informed that [plaintiff] might be having a heart attack . . . was present when [plaintiff] displayed symptoms consistent with a heart attack . . . and refused to drive [plaintiff] to the hospital." *Id.* It was the officer's basic refusal to address the plaintiff's severe chest pain, not the length of the delay, that established the officer's deliberate indifference to the plaintiff's severe chest pain. From this ruling, any reasonable correctional officer would understand that ignoring a detainee's repeated and vocal pleas to receive treatment for severe chest pain would constitute deliberate indifference of the detainee's right to medical care. Accordingly, the Court finds Plaintiff's constitutional right to medical treatment was clearly established by July 2017, and that, as a result, neither Defendant

19

Hill nor Defendant Silva is entitled to qualified immunity. As such, the Court must deny the Motion with respect to Claim I of the Amended Complaint.

II.    Plaintiff's Claims Against Defendants Board and Barela

Plaintiff brings two claims against Defendants Board and Barela: a federal municipal liability claim asserting that they maintained a custom and practice of violating the constitutional rights of pretrial detainees and a New Mexico state law claim for the negligent maintenance of a medical facility.

A.    Municipal Liability Claim

Plaintiff alleges that Defendants Board and Barela "practiced a custom and policy of providing inadequate medical care to inmates at DACDC" and are therefore liable for the violations of his constitutional right to medical care committed by Defendants Hill and Silva. Supreme Court precedent leaves no doubt that §1983 does not provide an action for respondeat superior liability. *See Ashcroft v. Iqbal,* 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."). Therefore, Defendants Board and Barela cannot be held liable solely on the basis of their employer-employee relationship with Defendants Hill and Silva. *See Monell v. New York City Dept. of Soc. Servs.,* 436 U.S. 658, 689 (1978). "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to present official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694. The Supreme Court has explained:

> Locating a "policy" ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality. Similarly, an act performed pursuant to a "custom" that has not been formally

approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law.

*Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown,* 520 U.S. 397, 403-404 (1997) (citing *Monell,* 436 U.S. at 694). In addition, the plaintiff must demonstrate "a direct causal link between the policy or custom and the injury alleged." *Bryson v. City of Okla. City,* 627 F.3d 784, 788 (10th Cir. 2010) (quotation omitted).

A municipality's conduct meets the *Monell* policy-or-custom requirement only if, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Brown,* 520 U.S. at 404 (emphasis and quotation marks in original). In *Brown,* the Supreme Court conveyed the strictness of the standard: "where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employees," *Id.* at 405. The Tenth Circuit has articulated five possible forms that a municipal policy or custom may take for §1983 liability to attach:

> (1) A formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Bryson,* 627 F.3d at 788 (quotations, citations, and alterations omitted).

Here, Plaintiff alleges that there were two formal policies that Defendants Board and Barela should have known would lead to unconstitutional delays of medical care: (1) a DACDC policy allowed detention staff to supervise detainees prior to receiving the required training on emergency

medical response and (2) a policy that prohibited detention staff from calling 911 until directed by medical staff. Doc. 64 at 26. Plaintiff further alleges that Defendant Barela set in place a custom and practice of neglecting inmate medical needs at DACDC. *Id.* at 27. The Court addresses each claim in turn.

      1.  <u>Failure-to-Train</u>

Plaintiff argues that Defendants Board and Barela should be held liable for DACDC's policy that allows officers to supervise detainees prior to completing emergency medical response training. He alleges that Defendant Silva had not received the proper emergency medical response training prior to July 3, 2017, when he ignored Plaintiff's severe chest pain for 45 minutes. Plaintiff's claim is that Defendants Board and Barela had an official policy of allowing officers to work without adequate training. The Court construes as a "failure-to-train" claim because Plaintiff alleges that the policy resulted in deficient training in general, and specifically, in Defendant Silva's violation of Plaintiff's constitutional right to medical care. *See Bryson,* 627 F.3d at 788.

When a plaintiff brings a failure-to-train claim, the municipal entity cannot be held liable for its failure to train employees unless the municipality's policymakers "can reasonably be said to have been deliberately indifferent to the need" for further training. *Id.* at 789 (citing *City of Canton, Ohio v. Harris,* 489 U.S. 378, 390 (1989)). "The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Id.* (quoting *Barney v. Pulsipher,* 143 F.3d 1299, 1307-08 (10th Cir. 1998), superseded on other grounds by 42 U.S.C. § 1997e). Notice can be established by "proving the existence of a pattern of tortious conduct," or "in a narrow range of circumstances . . . deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation

of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction." *Id.* One such circumstance may occur "when a municipality fails to train an employee in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations." *Id.* Further, "it is not enough" for a plaintiff "to show that there were general deficiencies in the county's training program for jailers." *Lopez v. LeMaster,* 172 F.3d 756, 760 (10th Cir. 1999), abrogation on other grounds recognized by *Brown v. Flowers,* 974 F.3d 1178 (10th Cir. 2020). Rather, a plaintiff "must identify a specific deficiency in the county's training program closely related to his ultimate injury *and* must prove that the deficiency in training actually caused his jailer to act with deliberate indifference to his safety." *Id.* Thus, in analyzing a failure-to-train claim, courts must ask whether there is evidence that the injury would "have been avoided had the employee been trained under a program that was not deficient in the identified respect." *Canton,* 489 U.S. at 391.

In the instant case, the record shows that individuals hired to work as corrections officers at DACDC must attend the Detention Center Academy, which involves 160 hours of classroom instruction and 80 hours of on-the-job training, for a total of 240 hours. Doc. 64-4 at 4. Per the DACDC's Standard Operation Procedures ("SOP"), officers may work shifts independently before completing the Academy, as long as they have received at least 40 hours of training. *Id.* ("All uniformed officers will receive at least 40 hours of training before being independently assigned in the facility, and at least 40 hours of training each year after."). For instance, trainees who have not completed the Academy are permitted to operate the pod control room and are "responsible for overseeing detainees for training purposes." Doc. 64-10 at 2. The evidence shows that by July 3, 2017, Defendant Silva had completed the 40 hours of training required to work independently.

However, he did not formally complete training on emergency response until September 11, 2017. Doc. 64-10.

In contrast to other cases denying failure-to-train claims at the summary judgment stage, Plaintiff here has identified a specific deficiency in the training program that is closely related to his ultimate injury, namely a lack of emergency response training. *Cf. Lopez,* 172 F.3d at 760 ("Appellant did not only name his jailer as a defendant in this suit, he failed to identify him at all . . . [n]or has he shown that the county had a uniform policy of providing its jailers with insufficient training in the areas closely related to his ultimate injury."). Training on correctional officers' response to detainee's medical emergencies is closely related to the injury Plaintiff suffered in the instant case, as he suffered severe pain for 45 minutes while asking Defendant Silva to call for medical assistance. Proper training on the appropriate response to severe chest pain could have prevented this unnecessary delay. *Canton,* 489 U.S. at 391.

While Defendants argue that Defendant Silva had received training in emergency medical response before July 3, 2017, the record does not support this contention, as it establishes only that he completed the 40 hours of training necessary to work independently. There is no evidence that Defendant Silva received training in emergency medical response during those 40 hours. Indeed, Defendants provided no evidence as to what subjects are taught during the initial 40-hour training, much less evidence that the initial 40-hour training includes emergency medical response training. *See* Doc. 64-4 at 4. Looking at the evidence in the light most favorable to the Plaintiff, it may be that Defendant Silva's 40 hours of training did not contain training on emergency medical response. Accordingly, there is a genuine issue of material fact as to whether Defendants Board and Barela failed to train correctional officers on medical emergency response before permitting them to work in the jail pods independently. The Court therefore will deny the Motion as to this

24

claim. *Cf. Gose v. Bd. of Cnty. Comm'rs of Cty. of McKinley,* 778 F. Supp. 2d 1191, 1210 (D.N.M. 2011) (granting summary judgment where plaintiff had not presented evidence concerning any deficiencies in correctional officer's training or evidence of a uniform policy in not training officers).

2.   Policy Prohibiting Officers From Calling 911

Plaintiff alleges that DACDC had an unconstitutional policy that prohibited detention staff from calling 911 until directed to do so by medical staff. He alleges that "it is inevitable that a policy such as this one will lead to unconstitutional delays in access to medical care." Doc. 64 at 26. Defendants argue that due process does not require detention center personnel to call 911 when medical personnel are available in the facility. Doc. 76 at 22.

Plaintiff has presented no evidence that there was a formal policy prohibiting detention center staff from calling 911. In support of his claim, Plaintiff cites to the parties' Undisputed Material Fact ¶ 19 in Defendant's Motion, which states that "Corizon is responsible for determining when emergency services need to be called, prompting Nurse Salazar to instruct Officer Gamboa to call 911." Doc. 51 at 6. In support of this fact, three exhibits are cited. First, the Motion cites to paragraph 12 of the Declaration of Tiara Gamboa, which states that "Corizon nurse Veronica Salazar told me to call 911, and I went to master control to have them call 911 and relay logistical instructions for the paramedic." Doc. 51-7 ¶ 12. The Motion also cites to paragraph 12 of the Declaration of Enrique Perez, which states that "[o]nce a detainee is in the medical unit, if Corizon medical staff determines that a detainee needs to go to the hospital, they will let DACDC staff know. Then, the sergeant at arms in master control will contact emergency services." Doc. 51-8 ¶ 12. Lastly, the Motion cites to paragraph 8 of the Declaration of Ricardo Montelongo, which states that "[w]hen Corizon medical staff determines that a detainee must go to the hospital, the

25

rover sergeant calls a Code 55 to master control who contacts emergency services." Doc. 51-9 ¶ 8. None of these declarations reflects a DACDC policy expressly prohibiting detention center staff from calling 911. Nor has Plaintiff supplied any additional evidence to support the existence of such a policy.

Admittedly, there is also no evidence of a policy authorizing correctional officers to dial 911 in case of an emergency. This is inapposite, however, because Plaintiff has failed to demonstrate "a direct causal link between the policy or custom and the injury alleged." *Bryson,* 627 F.3d at 788. The underlying constitutional violation is Defendants Hill and Silva's delay in performing their gatekeeping duties to provide access to medical care when Plaintiff presented with symptoms of a heart attack. Plaintiff has not alleged that this delay would not have occurred if Defendants Hill and Silva could have called 911 instead of calling the medical unit. Indeed, Plaintiff plausibly alleges that this was likely related to a lack of training on the appropriate response to medical emergencies. If, as is Plaintiff's theory, Defendants Hill and Silva ignored Plaintiff's symptoms due to a lack of knowledge about the seriousness of the situation or due to a deliberate lack of care, then their ability or inability to call 911 has no causal relationship to the underlying constitutional violation. Because Plaintiff has provided no evidence of the existence of a policy prohibiting correctional officers from calling 911, and because the existence or nonexistence of such a policy has no causal relationship to the underlying constitutional violation, the Court will grant summary judgment as to this theory of liability.

   3.   <u>Defendant Barela's Creation of an Informal Custom of Neglecting the Medical Needs of Detainees</u>

Plaintiff alleges that Defendant Barela established a custom and practice of neglecting the medical needs of detainees. Doc. 64 at 27. In support of this claim, Plaintiff notes that Defendant Barela was previously found liable for his unconstitutional custom and policies at DACDC in

connection with the unconstitutional delay of medical care for a detainee in *Slevin v. Bd. Of Comm'rs for the Cnty. of Doña Ana,* 08-CV-1185. Plaintiff states that, following the verdict, Defendant Barela "continued to push forward his custom of indifference to inmate welfare and health." Doc. 64 at 27. Furthermore, he adds that, in December of 2015, Defendant Barela was charged with embezzlement, fraud, willful neglect of duty, and bringing contraband into the jail. *Id.* He notes that, in August of 2017, Defendant Barela's employment was terminated as a result of his criminal charges. Doc. 64-12. Plaintiff also attaches an affidavit signed by Ross Hensel, who was housed at DACDC in the summer of 2017. In his affidavit, Mr. Hensel states that "the guards at DACDC never took medical complaints seriously and refused to respond to inmate requests for medical attention." Doc. 64-8 ¶ 8. Accordingly, Plaintiff argues that "Defendant Barela's actions created a culture that not only allowed, but encouraged DACDC staff, including Defendants Silva and Hill to disregard the welfare of inmates and specifically practice indifference towards inmates' medical needs." Doc. 64 at 28. Defendants argue that Plaintiff has not established sufficient facts to succeed on an informal policy claim because Plaintiff "has not identified any specific conduct or other DACDC employee involved in the *Slevin* case nor how this conduct was a widespread practice tantamount to a custom." Doc. 76 at 23-24.

In order for a municipality to be held liable under § 1983 for an informal custom, the custom must "amount to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." *Bryson,* 627 F.3d at 788 (cleaned up). "In order to establish a custom, the actions of the municipal employees must be continuing, persistent and widespread." *Carney v. City and Cnty. of Denver,* 534 F.3d 1269, 1274 (10th Cir. 2008). To prove the existence of such a continuing, persistent and widespread custom, "plaintiffs most commonly offer evidence suggesting that

similarly situated individuals were mistreated by the municipality in a similar way." *Id.* Plaintiffs must also demonstrate that "there is a direct causal link between the policy or custom and injury alleged." *Bryson,* 627 F.3d at 789 (quoting *Hinton,* 997 F.2d at 782).

Essentially, Plaintiff has presented evidence of one other instance of DACDC officers delaying medical care for a detainee, along with an affidavit from a detainee stating that detention officers often did this. This is insufficient to establish a "continuing, persistent and widespread" custom. *See Gable v. City of Chicago,* 296 F.3d 531, 538 (7th Cir. 2002) (finding that three incidents in a four-year period "were too few to indicate that the City had a widespread custom of which City policymakers had reason to be aware"); *Sodaro v. City and Cnty. of Denver,* 629 F. Supp. 3d 1064, 1082 (D. Colo. 2022) (two prior instances of First Amendment violations by police officers were insufficient to "plausibly allege a widespread practice of constitutional violations similar to that alleged in the case"); *Compare Epps v. City and Cnty. of Denver,* 588 F. Supp. 3d 1164, 1175 (D. Colo. 2022) (denying summary judgment on *Monell* claim where Plaintiff had presented several expert witness reports that identified numerous customs and practices of the Denver Police Department). Because Plaintiff has not presented sufficient evidence to establish a widespread custom or practice of neglecting the medical needs of detainees at DACDC, the Court will grant summary judgment as to this theory of liability. *Carney,* 534 F.3d at 1274.

B. <u>Negligent Operation of a Medical Facility under the New Mexico Tort Claims Act</u>

Plaintiff brings a claim under the New Mexico Tort Claims Act ("NMTCA"), alleging that Defendants Board and Barela allowed Corizon Health Services to provide substandard care, or no care at all, to detainees in DACDC. Doc. 59 ¶¶ 217-18. In the Amended Complaint, Plaintiff states that Corizon refused to take detainees to the hospital even when necessary, as a cost-saving mechanism. *Id.* ¶ 219. He further alleges that the New Mexico Department of Corrections

terminated its contract with Corizon in 2016, following the filing of approximately 150 lawsuits by inmates who alleged inadequate/nonexistent medical care by Corizon. *Id.* ¶ 222. He alleges that despite the numerous lawsuits, Defendants Board and Barela still chose to contract with Corizon to provide medical care at DACDC and that they failed to monitor the contract to ensure that inmates at DACDC received adequate care. *Id.* ¶¶ 224-25.

The NMTCA waives sovereign immunity for tort claims against government officials under certain circumstances. Section 41-4-9 of the NMTCA provides:

> The immunity granted pursuant to Subsection A of Section 41-4-4 NMSA 1978 does not apply to liability for damages resulting from bodily injury, wrongful death, or property damage caused by the negligence of public employees while acting within the scope of their duties in the operation of any hospital, infirmary, mental institution, clinic, dispensary, medical care home, or like facilities.

N.M. Stat. Ann. § 41-4-9. Plaintiff argues that while Corizon Health provides medical services at DACDC, a DACDC employee known as the "Captain of Healthcare" is tasked with oversight and supervision of the medical unit, "including maintaining a log of Corizon employees' scheduled meetings; evaluating contractor compliance; assists and coordinates training of Corizon employees; and assesses, oversees and monitors issues of compliance with conducting visual checks, responses to sick calls, and 14-day physical evaluations." Doc. 64 at 29. Plaintiff alleges that the Captain of Healthcare participates in monthly and bimonthly meetings with Corizon staff regarding inmate care and ensures that Corizon employees receive training on DACDC's policies. *Id; see also* Doc. 64-1. Accordingly, Plaintiff asserts that DACDC oversaw the operation of the medical unit in the facility and that § 41-4-9 applies.

In support of his argument, Plaintiff relies upon this Court's assertion in *Tanner v. McMurray,* No. 17-CV-876 JB/KBM, 2018 WL 6050675, at *61 (D.N.M. Nov. 19, 2018), that for purposes of § 41-4-9, the Supreme Court of New Mexico's decision in *Silva v. State,* 745 P.2d 380

(N.M. 1987), suggests that "the mere fact that a contractor operates a medical facility within a jail does not preclude § 41-4-9's applicability to public employees." In *Silva,* the plaintiffs brought a claim under § 41-4-9, alleging that the negligent failure of the defendants to provide adequate mental health care caused Silva to commit suicide while incarcerated at a facility of the Corrections Department. The trial court initially held that § 41-4-9 did not apply to the Secretary of Corrections. However, the Supreme Court of New Mexico held this to be error, because the Secretary of Corrections' duties included exercising "general supervisory authority over all department employees" and "issu[ing] and enforc[ing] orders and instructions." 745 P.2d at 386. Accordingly, the Supreme Court found that it was for "the finder of fact to determine whether [the Secretary] failed to exercise ordinary care in the discharge of these duties as they may be found to include the operation or maintenance of the corrections and medical care facilities and health care services proximately related to the death of Silva." *Id.*

Plaintiff's reliance on the *Tanner* court's interpretation of the *Silva* case is misguided. Following the Supreme Court of New Mexico's decision in *Silva,* the Court of Appeals of New Mexico has since interpreted § 41-4-9 to provide that, in order to "operate" a health care facility for purposes of the statute, a public employee must be involved in *clinical decision-making*. *Armijo v. Dep't of Health and Environment,* 775 P.2d 1333, 1335 (N.M. Ct. App. 1989). Accordingly, in *Lessen v. City of Albuquerque,* the Court of Appeals found that where a jail has contracted out the provision of medical care in the facility, the governmental entity has not waived sovereign immunity under the NMTCA and § 41-4-9 does not apply. 187 P.3d 179, 185 (N.M. Ct. App. 2008); *see also Kellum v. Bernalillo Cnty.,* No. 14-CV-163 RB/CG, 2015 WL 12859577 (D.N.M. June 9, 2015) (holding that § 41-4-9 was inapplicable to Bernalillo County because an independent contractor operates the medical unit at the Metropolitan Detention Center); *Prince v. City of*

*Deming,* No. 18-CV-899 JB/GBW, 2020 WL 1821259, at *28 (D.N.M. April 10, 2020) (holding that under § 41-4-9, "[f]or a non-contractor person or entity to be liable, the claims against him must relate to the actual medical care — and specifically to the clinical decision-making or supervision of clinical decision-making—at the unit in question"). This is not inconsistent with the holding in *Silva,* as that decision merely left it up to the trier of fact to determine whether, as part of his ordinary duties, the Secretary of Corrections "operated" the medical care facilities inside correctional facilities for purposes of § 41-4-9. Following the decisions in *Armijo* and *Lessen,* it is clear that a public employee does not "operate" a medical care facility under § 41-4-9 unless they are involved in, or supervise treatment decisions about, individuals' healthcare.

While Plaintiff has presented evidence that the Captain of Healthcare is in charge of administrative and logistical supervision of Corizon Health staff, there is nothing in the record that indicates that the Captain of Healthcare is equally involved in the decision of medical staff to transport a detainee to a hospital, let alone in any clinical decision making. Consistent with *Armijo* and *Lessen,* the Court therefore finds that Defendants Board and Barela have not waived sovereign immunity under § 41-4-9 and the Court will grant summary judgment on this claim.

## CONCLUSION

The Court finds that Defendants Hill and Silva are not entitled to qualified immunity and, accordingly, the Motion for Summary Judgment will be denied with respect to Claim I of the Amended Complaint. With respect to Defendants Board and Barela, the Court finds that Plaintiff has raised a genuine issue of material fact regarding his failure-to-train theory of municipal liability and, therefore, the Court will deny the Motion with respect to Claim IV of the Amended Complaint only with respect to the failure-to-train claim. Plaintiff has not presented sufficient evidence to proceed on his theory that there was an unconstitutional policy prohibiting detention officers from

calling 911 absent directives from medical staff or that there was an informal custom and practice of ignoring the medical needs of detainees. Accordingly, the Court will grant the Motion with respect to those two theories of liability. Lastly, the Court finds that Defendants Board and Barela have not waived sovereign immunity under the New Mexico Tort Claims Act and, therefore, will grant the Motion for Summary Judgment with respect to Claim III of the Amended Complaint.

DATED this 3rd day of March, 2025.

_____
MARTHA VÁZQUEZ
Senior United States District Judge