UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

ANTONIO REALI,

   Plaintiff,

vs.                No. 2:19-CV-00603 MV/JHR

BOARD OF COUNTY COMMISSIONERS
FOR THE COUNTY OF DOÑA ANA, CORIZON
HEALTH, INC., CHRISTOPHER BARELA,
VERONICA SALAZAR, DAVID MILLER,
ROSLYN STROHM, KEVIN SILVA,
and CHAD HILL
     Defendants.

## MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court on the Motion for Partial Summary Judgment Based on Qualified Immunity filed by Defendants David Miller, Roslyn Strohm, and Veronica Salazar. Doc. 78. Plaintiff has filed an affidavit pursuant to Federal Rule of Civil Procedure 56(d) requesting that the Court either defer ruling on or deny the Motion for Partial Summary Judgment. Doc. 84-3. Having considered the briefs and relevant law, and being otherwise fully informed, the Court finds that relief under Federal Rule of Civil Procedure 56(d) is warranted and will deny the Motion for Partial Summary Judgment without prejudice to allow for additional discovery.

## BACKGROUND

"The facts supported by evidence, [viewed] in the light most favorable to [Plaintiff]" as the party opposing summary judgment are as follows. *Cavanaugh v. Woods Cross City,* 625 F.3d 661, 662 (10th Cir. 2010). Plaintiff was booked into the Doña Ana County Detention Center ("DACDC") on May 31, 2017. Doc. 78-2. During his incarceration, DACDC contracted with Corizon Health to provide medical service. Corizon employed Defendants Salazar, Strohm, and Miller as medical providers. Doc. 78-3, Declaration of Jason Duran, ¶ 3. Upon his intake to the

detention center, Plaintiff was seen by Corizon nurse Steven Gomez. Doc. 78-3, Exhibit A. The intake noted that Plaintiff reported a prior history of hypertension, as well as seizures and a heart attack within the last six months. *Id.* at COR-Reali000110. The intake did not indicate a need for an urgent medical referral. *Id.* at COR-Reali000108. A transfer of medical information form from Madera County Jail to DACDC, dated May 28, 2017, noted that Plaintiff had a history of chest pains. *Id.* at COR-Reali000214. At intake, Plaintiff also reported a history of major depression, taking psychotropic medications, experiencing visual and audio hallucinations, and head trauma. *Id.* at COR-Reali000111. Although the parties disagree as to whether Plaintiff received two medical screenings on the night of May 31, the record shows that, at some point, Plaintiff relayed to Nurse Gomez that he had a history of post-traumatic stress disorder and anxiety. *Id.* at COR-Reali000147. Nurse Gomez filled out a mental health referral for Plaintiff to be seen by the mental health department. *Id.*

On June 6th, 2017, Plaintiff was seen by Defendant Strohm for a chronic care clinic appointment. Doc. 78-3 at COR-Reali000146. Defendant Strohm's notes from the encounter show that Plaintiff was receiving Depakote from his psychiatrist at the VA. *Id.* at COR-Reali000154. Her notes further state that Plaintiff reported that he first had a seizure a year prior, that his most recent seizure had occurred two weeks prior, and that he had a history of chest pains where he would "drop[] to [the] ground" and then the pain would go away. *Id.* Plaintiff also reported that he would lose consciousness and vomit from the chest pain. *Id.* Defendant Strohm noted that Plaintiff's chest pains would be relieved through "deep breathing." *Id.* In the section titled "overall condition," Defendant Strohm wrote, "stable." *Id.* Defendant Strohm indicated that a follow up appointment in 90 days was needed. *Id.* at COR-Reali000155. On June 7, Defendant Strohm ordered an EKG to be performed on Plaintiff to determine a "baseline" for his complaints of chest

2

pain. *Id.* at COR-Reali000148. An EKG was performed on Plaintiff on June 9 and the results were interpreted as being normal. *Id.* at COR-Reali000204. Plaintiff was seen in the medical unit again on June 10, 2017, for various tests, including a metabolic panel, a lipid panel, and urinalysis. *Id.* at COR-Reali000144. On June 17, Plaintiff went to the medical unit complaining of chest pain and was seen by Defendant Salazar. *Id.* at COR-Reali000143. During his assessment, Plaintiff reported that he was upset because the phones at the detention center were broken, but that his chest pain had resolved. *Id.* Plaintiff's blood pressure was at 162/108, an elevated number. *Id.* Noting this, Defendant Salazar called Defendant Strohm, who then ordered that Plaintiff receive a dose of Clonidine and come back for blood pressure checks. *Id.*

On June 19, a corrections officer called the medical unit and stated that Plaintiff was having "heart problems." *Id.* at COR-Reali000142. Plaintiff went to medical and stated that he thought his blood pressure was high. *Id.* The medical notes from the visit state that Plaintiff denied complaints of chest pain and shortness of breath. *Id.* Nurse Andrea Mook took his blood pressure, which was at 144/96. *Id.* When given the results, Plaintiff stated, "Oh, that's not bad. Can I go?" *Id.* Nurse Mook reminded Plaintiff of deep breathing and visualization as methods to control anxiety. *Id.*

Plaintiff was seen in the medical unit on June 21 for a vital signs assessment. *Id.* at COR-Reali000141. He denied any medical concerns at this visit. *Id.* His blood pressure was at 137/94 and his heart rate was noted as being normal. *Id.* Nurse Mook took another medical history of Plaintiff. *Id.* This medical history contained the same information as the intake form from May 31, 2017, with the exception that it did not mention that Plaintiff had a history of hypertension. *Id.* at COR-Reali000123.

Plaintiff went to the medical unit again at 9:46 a.m. on July 1 for reports of chest pain. *Id.* at COR-Reali000137. Plaintiff reported that his pain was at an 8 out of 10 on a pain scale and Nurse Mook noted that his skin was pale *Id.* at COR-Reali000151. He laid down on the floor in front of the bench. *Id.* at COR-Reali000137. Nurse Mook's notes reflect that he had a history of three prior myocardial infarctions and had intermittent chest pain that would get better after he laid down and vomited. *Id.* at COR-Reali000151. At that time, his blood pressure was at 174/130 and an EKG was ordered. *Id.* By 9:52 a.m., Plaintiff's blood pressure was at 170/110 and he reported that the chest pain had subsided. *Id.* at COR-Reali000136. The EKG results were abnormal and on a Nurse Encounter form, Nurse Mook checked a box labeled "Urgent Intervention-Contact Practitioner." *Id.* at COR-Reali000152. Defendant Strohm ordered that Plaintiff be kept in the medical unit for observation until a repeat EKG was performed. *Id.* at COR-Reali000148. Defendant Strohm reviewed the initial EKG results on July 2; her notes on the results state that Plaintiff had a "clinical non-acute presentation," that his chest pain was not radiating, and that the pain had resolved after a few minutes. *Id.* at COR-Reali000202. At 10:56 a.m. on July 1, a repeat EKG was performed which had normal results. *Id.* at COR-Reali000200.

At 10:41 p.m. on July 1, a Code Mary, which is for medical emergencies, was called in Gulf pod 2, where Plaintiff was housed. *Id.* at COR-Reali000134. When medical staff entered the pod, Plaintiff was lying on the floor, groaning and telling everyone not to touch him. *Id.* Plaintiff stated, "I told [the pod officer] I needed to go to medical earlier, I could have made it." *Id.* After about two or three minutes, Plaintiff was able to move to a wheelchair and was taken to medical for an evaluation. *Id.* Defendant Salazar saw Plaintiff and Plaintiff told her he needed to vomit, but did not do so. *Id.* Plaintiff informed Defendant Salazar that the pain was starting to subside. *Id.* He described the pain as a "dull intense pain" in his mid-sternum. *Id.* His blood pressure was at

4

188/110 and an EKG showed "nonspecific lateral changes," which was interpreted as "borderline." *Id.* Defendant Salazar informed Defendant Strohm of the situation; Defendant Strohm ordered that Plaintiff receive a dose of Clonidine and Lisinopril every morning. *Id.* Plaintiff was sent back to his pod. *Id.*

Although the exact timing is not clear from the record, at some point on the morning of July 2, Plaintiff was brought into medical, yelling, "Don't touch me! Oh, it hurts." *Id.* at COR-Reali000133. He was lying down on the floor kicking and screaming. *Id.* When he came into the medical unit, his blood pressure was at 160/90. *Id.* This was the fifth time that Plaintiff had been to medical for chest pain. *Id.* at COR-Reali000122-123. Plaintiff had an EKG performed at 9:11 a.m., which showed inferior/lateral ST-T changes, an abnormal result. *Id.* at COR-Reali000196. Plaintiff then stated that the pain had subsided, that he had a history of "psych problems" and had been diagnosed with anxiety. *Id.* at COR-Reali000133. He stated that he had been assessed at the VA multiple times and that they could not find anything wrong, "so it must be psych." *Id.* He further stated, "I've had 2 heart attacks before and I know it is not that. I think it is in my lungs from smoking meth and PTSD from being blown up." *Id.* He stated that he had never been formally diagnosed with a myocardial infarction, but had diagnosed himself from two episodes in the past that were similar to the episode which had occurred that morning. *Id.* Plaintiff also reported that he had missed his medication that morning because his cellmates did not wake him up in time for breakfast. *Id.* Defendant Strohm noted that Plaintiff had responded well to previous doses of Clonidine and ordered a follow up EKG to be performed after Plaintiff received a dose of Clonidine. *Id.* Another EKG was performed at 10:30 a.m., which showed non-specific lateral ST changes, an abnormal result. *Id.* at COR-Reali000194. Defendant Strohm ultimately diagnosed Plaintiff with anxiety and noted that he was "asymptomatic." *Id.* at COR-Reali000133.

5

At approximately 6:58 p.m. on July 2nd, Defendant Miller took Plaintiff's vital signs. *Id.* at COR-Reali000132. Plaintiff's blood pressure was at 104/84 and he did not voice any concerns during the encounter. *Id.* Defendant Miller administered the Clonidine medication as ordered previously by Defendant Strohm and noted that Plaintiff would continue to be monitored. *Id.* It does not appear that any further monitoring was conducted on July 2nd. At 3:38 a.m. on July 3rd, a "possible Code Mary" was called in the Gulf pod. *Id.* at COR-Reali000131. When medical staff went to respond to the code, correctional officers informed them that Plaintiff was walking to the medical unit. *Id.* When he arrived at the medical unit, Plaintiff was grunting and clutching his chest, stating, "It hurts, what's happening to me." *Id.* At 3:40 a.m., Defendant Salazar attempted to take Plaintiff's blood pressure, but was unable to do so because Plaintiff was moving, grunting, yelling, and hyperventilating. *Id.* At 3:42 a.m., Plaintiff sat up, stated that he could not breathe, and then lost consciousness. *Id.* He tensed up and exhibited "seizure like activity." *Id.* Plaintiff was given oxygen via a bag valve mask and he lost bladder and bowel control. *Id.* Medical staff instructed correctional officers to call 911 at 3:44 a.m., and the ambulance was called at 3:48 a.m. *Id.*; Doc. 64-6 at 2. At 3:46 a.m., Defendant Strohm was advised over the phone that Plaintiff was possibly having a seizure, that his body was stiff, and that he was unresponsive to a sternal rub, eye flick, and voice commands. *Id.* Defendant Strohm ordered that Plaintiff receive 4 mg of Ativan and be transferred to the emergency room. *Id.* At 3:51 a.m., 4 mg of Ativan were administered to the Plaintiff via injection. *Id.* At 3:55 a.m., medical staff were unable to find a pulse on Plaintiff, so Defendant Miller started CPR. *Id.* Emergency personnel arrived shortly after and took over the CPR at 3:56 a.m., administered two rounds of epinephrine, one round of Narcan, and a shock via a defibrillator. *Id.* A pulse was obtained at 4:10 a.m. and Plaintiff was transported to Memorial Medical Center at approximately 4:24 a.m.. Doc. 64-6 at 2.

In his Amended Complaint, Plaintiff alleges in Count I that Defendants Strohm, Salazar, and Miller deprived him of his Fourteenth Amendment right to adequate medical care. Although Plaintiff raised state law claims against Defendants Strohm, Salazar, and Miller in Count II of his Amended Complaint, Defendants filed the instant Motion only with respect to Count I.

**DISCUSSION**

**I.     Defendants Are Not Entitled To Raise A Defense of Qualified Immunity.**

As a threshold question, the Court must determine whether Defendants are eligible to assert a qualified immunity defense. *Weise v. Casper,* 507 F.3d 1260, 1264 (10th Cir. 2007) (the qualified immunity analysis "can only proceed after the court determines that a defendant is entitled to assert qualified immunity in the first instance"). Plaintiff asserts that Defendants are not entitled to raise the defense. The Court agrees.

When determining whether a private party is entitled to the defense of qualified immunity, "courts look both to history and to the purposes that underlie government employee immunity to determine whether qualified immunity applies." *Estate of Lockett by and through Lockett v. Fallin*, 841 F.3d 1098, 1108 (10th Cir. 2016). In *Tanner v. McMurray,* the Tenth Circuit clarified that "the availability of qualified immunity to private parties performing governmental functions depends on (1) 'the common law as it existed when Congress passed § 1983 in 1871' and (2) the policy reasons the Supreme Court has 'given for recognizing immunity under § 1983.'" 989 F.3d 860, 867 (10th Cir. 2021) (quoting *Filarksy v. Delia,* 566 U.S. 377, 384, 389 (2012)). Accordingly, "[p]rivate individuals are entitled to assert qualified immunity if their claim is supported by historical practice or based on public policy considerations." *Id.* (quoting *Rosewood Servs., Inc. v. Sunflower Diversified Servs., Inc.,* 413 F.3d 1163, 1166 (10th Cir. 2005)). Applying this principle, the *Tanner* Court ultimately held that "the employees of private corporations providing medical

7

care in correctional facilities under circumstances similar to those presented in this case are not entitled to assert qualified immunity." *Id.* at 865. Because the Defendants in the instant case were providing medical care under circumstances analogous to those in *Tanner,* the Court finds that they are not entitled to assert the defense of qualified immunity.

In *Tanner,* the plaintiff, an inmate incarcerated at the Metropolitan Detention Center in Albuquerque, New Mexico, alleged that the defendants, a physician and two registered nurses employed by a nationwide private medical contractor, "ignored and minimized her symptoms, refused to transport her to a hospital, and failed to conduct even a cursory pelvic examination." 989 F.3d at 862. She alleged that these actions led to the stillbirth of her child. *Id.* The district court held that the defendants in *Tanner* were eligible to assert the defense of qualified immunity. The Tenth Circuit reversed the district court's decision, finding first that "[n]o circuit that has considered [the issue of qualified immunity for medical contractors in correctional facilities] has uncovered a common law tradition of immunity for full-time private medical staff working under the color of state law." *Id.* at 867. The Tenth Circuit then looked to the history of suits against doctors working in correctional facilities and determined that "[a]ll available authorities … point to the historical availability of tort remedies against physicians regardless of whether they were employed by a government entity." *Id.* at 868. Furthermore, the Tenth Circuit found that the public policy concerns motivating the defense of qualified immunity did not apply to medical staff employed by large medical contractors because the contractors would be incentivized by the market to provide adequate and comprehensive medical care. *Id.* at 868 ("Appellees at bar worked for a large corporation operating in a competitive market. Indeed, this market was evidently competitive enough that CCS was replaced as MDC's medical services provider after this incident.

As the loss of county contract demonstrates, CCS had every incentive to ensure that its employees were providing competent medical care.").

As in *Tanner,* Defendants in the instant case were "full-time employees of a private, for-profit corporation organized specifically to compete in the marketplace of providing comprehensive medical care in correctional facilities," namely Corizon Health, Inc. 989 F.3d at 871, 873 (emphasizing that the public policy considerations for qualified immunity did not apply to defendants' employer because it was "a nationwide company that is systematically organized to profit from providing medical care in correctional facilities"). Additionally, Defendants in this case similarly performed "their tasks independently, with only minimal ongoing direct state supervision," and "operated with near-complete discretion in providing medical care for detainees." *Id.* at 873; *see* Doc. 64-1 (Corizon Health contract with DACDC provided for administrative oversight of medical staff, but not for supervision over medical decision-making). The *Tanner* Court found that, under such circumstances, neither the state of common law when § 1983 was passed nor the public policy considerations motivating the defense of qualified immunity weigh in favor of finding that Defendants are entitled to the defense. As the circumstances here are virtually identical to those in *Tanner,* the Court is bound by that decision to find that Defendants in the instant case are not entitled to raise a defense of qualified immunity.

## II.  Summary Judgment

Having found that Defendants are not entitled to raise a defense of qualified immunity, the Court moves on to consider the question of summary judgment. Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the initial burden of establishing that there is an absence of evidence to support the non-movant's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the movant meets this burden, the non-movant must come forward with specific facts, supported by admissible evidence, that demonstrate the existence of a genuine dispute. *Comm. for First Amendment v. Campbell*, 962 F.2d 1517, 1526 n. 11 (10th Cir. 1992). The court "construe[s] the factual record and the reasonable inferences therefrom in the light most favorable to the nonmoving party." *Mata v. Saiz*, 427 F.3d 745, 749 (10th Cir. 2005).

In the instant case, Plaintiff alleges that Defendants violated his Fourteenth Amendment right to medical care by showing deliberate indifference to his serious medical needs. "Under the Fourteenth Amendment's Due Process Clause, pretrial detainees are entitled to the same degree of protection against denial of medical care as that afforded to convicted inmates under the Eighth Amendment." *Barrie v. Grand County, Utah,* 119 F.3d 862, 868 (10th Cir. 1997); *see also Blackmon v. Sutton*, 734 F.3d 1237, 1244 (10th Cir. 2013) ("[D]etention officials surely owe pretrial detainees . . . at least the same standard of care prison officials owe convicted inmates."). Accordingly, Plaintiff's due process claim must be assessed under the "deliberate indifference" standard developed in the Eighth Amendment context. *Blackmon*, 734 F.3d at 1244; *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1315 (10th Cir. 2002) ("Although pretrial detainees are protected under the Due Process Clause rather than the Eighth Amendment, this Court applies an analysis identical to that applied in Eighth Amendment cases brought pursuant to § 1983.").

Specifically, in *Estelle v. Gamble*, the Supreme Court held that "[a] prison official's deliberate indifference to an inmate's serious medical needs is a violation of the Eighth Amendment's prohibition against cruel and unusual punishment." *Mata*, 427 F.3d at 751 (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) ("[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment.")). Such deliberate indifference may be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle*, 429 U.S. at 104-05.

Under the *Estelle* deliberate indifference standard, the test for constitutional liability of prison officials "involves both an objective and a subjective component." *Mata*, 427 F.3d at 751 (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)). First, Plaintiff must show "objective evidence that the deprivation at issue was in fact 'sufficiently serious.'" *Id.* "A medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Sealock*, 218 F.3d at 1209 (citation omitted). Once a plaintiff has met the objective prong of the deliberate indifference test by demonstrating that his or her "medical need was objectively sufficiently serious and that defendants' delay in meeting that need caused [him] or her substantial harm," the plaintiff next must meet the subjective prong of the deliberate indifference test. *Id.* at 752. "[T]o meet the subjective prong of the deliberate indifference test, [the plaintiff is required] to provide evidence supporting an inference that defendants knew about and disregarded a substantial risk of harm to her health and safety." *Id.* Furthermore, "the official must

be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

Defendants argue that Plaintiff cannot establish the subjective component of a deliberate indifference claim because that component "is not satisfied where a medical professional exercises medical judgment, such as the decision as to whether to consult a specialist or to undertake additional medical tests for a patient." Doc. 78 at 13-14. The Tenth Circuit has held that in claims against prison medical staff, "the subjective component is not satisfied, absent an extraordinary degree of neglect, where a doctor merely exercises his considered medical judgment." *Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006). "A claim is therefore actionable only in cases where the need for additional treatment or referral to a medical specialist is obvious." *Id.* The Tenth Circuit has identified a few contexts in which a medical professional could be said to have ignored or mistreated an obvious need:

> (1) A medical professional recognizes an inability to treat the patient due to the seriousness of the condition and his corresponding lack of expertise but nevertheless declines or unnecessarily delays referral;
> (2) A medical professional fails to treat a medical condition so obvious that even a layman would recognize the condition; and
> (3) A medical professional completely denies care although presented with recognizable symptoms which potentially create a medical emergency.

*Id.* (cleaned up). Furthermore, "if a prison doctor, for example, responds to an obvious risk with treatment that is patently unreasonable, a jury may infer conscious disregard." *Id.* However, "where a doctor orders treatment consistent with symptoms presented and then continues to monitor the patient's condition, an inference of deliberate indifference is unwarranted under our case law." *Id.* at 1232-33.

Here, Plaintiff alleges that "Defendants knew that they lacked the resources to treat a heart attack and knew symptoms of a possible heart attack must always be sent to a hospital and were,

12

in fact, obligated to do so." Doc. 84. Plaintiff also alleges that "even a lay person would recognize the symptoms Plaintiff was suffering demanded transport to a local hospital." *Id.* at 25. Defendants argue that Plaintiff has presented no evidence to show that Defendants knew that they did not have the capacity to diagnose and treat heart attacks. Doc. 87 at 8. However, Plaintiff has submitted an affidavit, pursuant to Federal Rule of Civil Procedure 56(d), requesting the Court to deny the Motion for Summary Judgment so that Plaintiff can obtain depositions that will provide information as to Defendants' state of mind at the time of treatment. Doc. 84-3.

Pursuant to Federal Rule of Civil Procedure 56(d), "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition [to a motion for summary judgment]," the court may: (1) defer considering a motion for summary judgment or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order. Fed. R. Civ. P. 56(d); *see also Jensen v. Redevelopment Agency,* 998 F.2d 1550, 1553-54 (10th Cir. 1993). "The general principle of Rule 56(d) is that summary judgement should be refused where the nonmoving party has not had the opportunity to discovery information that is essential to [its] opposition." *Price ex rel. Price v. W. Resources, Inc.,* 232 F.3d 779, 783 (10th Cir. 2000). "Unless dilatory or lacking in merit," a party's 56(d) application "should be liberally treated." *Jensen,* 998 F.2d at 1553-54 (quoting *Comm. For 1st Amend v. Campbell,* 962 F.2d 1517, 1522 (10th Cir. 1992)).

Rule 56(d), however, is not a license for a "fishing expedition," *Lewis v. Ft. Collins,* 903 F.2d 752, 758 (10th Cir. 1990), and the party invoking Rule 56(d) must explain by affidavit why the party cannot present facts precluding summary judgment. *Price,* 232 F.3d at 783. The Tenth Circuit has held that a Rule 56(d) affidavit must satisfy four requirements: (1) identify the "probable facts not available," and (2) explain why those facts "cannot be presented currently," (3)

13

"what steps have been taken to obtain these facts," and (4) "how additional time will enable the party to obtain those facts and rebut the motion for summary judgment." *Id.*

A party seeking relief pursuant to Rule 56(d) first must identify by affidavit the "probable facts not available." *Price,* 232 F.3d at 783. Plaintiff alleges that, in order to present evidence that Defendants knew that Plaintiff's condition required immediate hospitalization and that they did not have the capacity to treat his condition, he needs to depose Corizon Nurse Andrea Mook, Defendant Salazar, Defendant Strohm, and Defendant Miller to determine:

a. What training Corizon medical staff receives regarding treatment and assessment of inmates experiencing chest pain;
b. Specific information about the individuals' encounters with Plaintiff;
c. Specific information communicated to Defendant Strohm regarding Plaintiff's complaints of chest pain and diagnostic results; and
d. Knowledge of emergency medical care and transport of inmates experiencing symptoms of heart attack.

Doc. 84-3 at 2-5. This information goes directly to the subjective component of the due process claim. Plaintiff initially requested "information on the defendants' training, education, and experience treating inmates exhibiting symptoms of heart attack and emergency medical response," but before he received any written responses from the Defendants, discovery in this matter was stayed pending the Court's resolution of the Motion for Summary Judgment on the Basis of Qualified Immunity filed by Defendants Board of County Commissioners for the County of Doña Ana, Christopher Barela, Kevin Silva, and Chad Hill [Doc. 51]. Doc. 55. The Court resolved that Motion on March 3, 2025. Doc. 105. Thus, the stay was in effect until that date, preventing Plaintiff from acquiring the information needed to prove the subjective component of the due process claim. Construing the motion liberally, *Jensen,* 998 F.2d at 1553-54, Plaintiff's affidavit satisfies the requirements set forth by the Tenth Circuit. He has identified the facts he needs to obtain, has listed the previous steps taken to obtain those facts, has explained that he has

been unable to do so because of the stay in discovery, and notes that additional time will allow him to conduct depositions of the identified witnesses. Accordingly, the Court will grant Plaintiff relief pursuant to Rule 56(d) and will deny Defendants' Motion for Partial Summary Judgment, without prejudice, to allow for additional discovery.

## CONCLUSION

For the foregoing reasons, the Court finds that Defendants Strohm, Salazar, and Miller are not entitled to assert the defense of qualified immunity. The Court further finds that Plaintiff's affidavit satisfies the requirements of Rule 56(d), and that, accordingly, the Motion for Partial Summary Judgment should be denied without prejudice to allow for further discovery.

**IT IS THEREFORE ORDERED** that Motion for Partial Summary Judgment Based on Qualified Immunity filed by Defendants David Miller, Roslyn Strohm, and Veronica Salazar [Doc. 78] is **DENIED** without prejudice, to allow Plaintiff time to acquire the relevant discovery.

ENTERED this 31st day of March, 2025.

_____
MARTHA VAZQUEZ
Senior United States District Judge